UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | **MDL 2804** |
| | ) | **Case No. 1:17-md-2804** |
| **THIS DOCUMENT RELATES TO:** | ) ) | |
| | ) | **Judge Dan Aaron Polster** |
| *Track Three Cases:* | ) ) | |
| | ) | **OPINION AND ORDER** |
| *County of Lake, Ohio v.* | ) | |
| *Purdue Pharma, L.P., et al.,* | ) | |
| *Case No. 18-op-45032* | ) | |
| | ) | |
| *County of Trumbull, Ohio v.* | ) | |
| *Purdue Pharma, L.P., et al.,* | ) | |
| *Case No. 18-op-45079* | ) | |

Before the Court are Defendants' Rule 50(b) Motions for Judgment as a Matter of Law (Doc. ##: 4202, 4203, 4206, and 4207).[1]  Plaintiffs filed an omnibus response (Doc. #: 4241), and Defendants filed replies (Doc. ##: 4256, 4257, 4259, and 4260).  For the reasons stated below, the Motions are **DENIED**.

* * *

After an eight-week trial, a jury found in favor of Plaintiffs, Ohio's Lake and Trumbull Counties ("the Counties"), in the liability phase of the trial of their absolute public nuisance claims. Plaintiffs claimed the unlawful and/or intentional dispensing conduct of Pharmacy Defendants – CVS, Walgreens, and Walmart – "substantially contributed to an oversupply of legal prescription opioids and to diversion of those opioids into the illicit market outside appropriate medical

---

[1] Defendants previously filed Rule 50(a) Motions (Doc. ##: 4098, 4100, 4102, and 4103) and renew those arguments in the present Rule 50(b) Motions.

channels, thereby endangering public health or safety and creating a public nuisance."  11/15/21

Trial Tr. at 7070-71 (Doc. #: 4153) (charge to the jury).  The jury found in favor of Plaintiffs on

liability, leaving the Court to determine the remedy of abatement in a phase two bench trial.  As

discussed below, Defendants raise a number of challenges to the jury's verdict.

## Legal Standard

Under Rule 50(a), a court should grant a motion for judgment as a matter of law when "a

party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a

reasonable jury to find for that party on that issue."  *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50(a)).  "A motion for judgment as a matter of

law may be made at any time before the case is submitted to the jury."  Fed. R. Civ. P. 50(a)(2).

If the court does not grant this motion, the moving party may renew the denied motion after trial on

the same grounds asserted in the earlier motion.  Fed. R. Civ. P. 50(b).  "A Rule 50(b) motion is only

a renewal of the preverdict motion, and it can be granted only on grounds advanced in the preverdict

motion."  *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 780 (6th Cir. 2020).

The standard for granting judgment as a matter of law "mirrors" the standard for summary

judgment, "such that 'the inquiry under each is the same.'"  *Reeves*, 530 U.S. at 150 (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)).  "In entertaining a motion for

judgment as a matter of law, the court should review all of the evidence in the record.  In doing so,

however, the court must draw all reasonable inferences in favor of the nonmoving party, and it

may not make credibility determinations or weigh the evidence."  *Id.* (citing *Lytle v. Household

Mfg., Inc.*, 494 U.S. 545, 554–55 (1990)).  "Credibility determinations, the weighing of the

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a

2

judge." *Id.* (quoting *Liberty Lobby*, 477 U.S. at 255).  "A motion for judgment as a matter of law should be granted 'only if reasonable minds could not come to a conclusion other than one favoring the movant.'"  *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 627 (6th Cir. 2020) (quoting *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 602 (6th Cir. 2018)).

## Analysis

In their joint motion, Defendants assert the trial evidence is insufficient to support liability on Plaintiffs' absolute liability claims, arguing no reasonable juror could have found that: (1) Defendants engaged in unlawful dispensing conduct; (2) Defendants engaged in intentional, culpable conduct; or (3) Defendants' conduct proximately caused a public nuisance in the Counties.  In their separate motions, Defendants also make arguments regarding the sufficiency of the evidence as to each Defendant.  Additionally, Defendants assert the public nuisance claims fail as a matter of law, regardless of the evidence presented at trial.

The Court has reviewed all of Defendants' arguments and finds each of them unpersuasive. For the reasons that follow, Defendants are not entitled to judgment as a matter of law on any of their legal theories.

## I.      Sufficiency of the Evidence

Defendants assert the trial evidence was insufficient to support the verdicts against them. Specifically, Defendants argue that Plaintiffs failed to establish either that: (1) Defendants engaged in unlawful or intentional conduct, or (2) Defendants' conduct proximately caused a public nuisance in the Counties.

To find a Defendant liable for creating a public nuisance, the jury was required to find the Defendant engaged in intentional and/or unlawful conduct "that caused a significant and ongoing interference with a public right to health or safety."  Further, Plaintiffs had to show the Defendant's conduct was "a substantial factor in creating the public nuisance."  11/15/21 Trial Tr. at 7077 (Doc. #: 4153).

A.      **Unlawful Conduct**

Defendants first assert the trial evidence was insufficient to show they knowingly engaged in unlawful dispensing conduct.  Joint Motion at 3-12 (Doc. #: 4202).  At the outset, the Court rejects Defendants' argument that Plaintiffs were required to show Defendants' pharmacists filled specific illegitimate prescriptions in the Counties.  This argument ignores the aggregate nature of Plaintiffs' theory of proof at trial.  Plaintiffs chose to demonstrate unlawful conduct by showing Defendants knowingly failed to take adequate measures to guard against diversion of prescription opioids.  In particular, Plaintiffs presented evidence of Defendants' dispensing of large quantities of highly addictive drugs in the Counties, while repeatedly failing to take legally-required, effective measures to identify and resolve "red flags" prior to dispensing, and failing to document any due diligence with respect to those red flags.[2]

Under the Court's instructions for unlawful conduct, the jury was required to find each Defendant's dispensing of controlled substances did not substantially comply with the Federal and

---

[2] A "red flag of diversion" is "a circumstance that does or should raise a reasonable suspicion as to the validity of a prescription."  *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 & 5195 Decision and Order*, 77 Fed. Reg. 62,316 at 62,341 (DEA Oct. 12, 2012).  Examples of red flags of diversion include a patient presenting simultaneous prescriptions for an opioid, a benzodiazepine, and a muscle relaxer (known to abusers as a "drug cocktail"); or a patient traveling a long distance to fill an opioid prescription and paying in cash.  Some prescriptions are so suspicious that they "present[] a collection of red flags that no reasonable and prudent pharmacist could resolve so as to lawfully fill the prescriptions."  *Id*. at 62,320

Ohio Controlled Substances Acts and their accompanying regulations.  11/15/21 Trial Tr. at 7074-75 (Doc. #: 4153).[3]  As the Court instructed, under these laws and regulations: (1) "entities that are authorized to dispense controlled substances are required to provide effective controls and procedures to guard against theft and diversion;" and (2) a pharmacy has "a corresponding responsibility for proper dispensing of controlled substances for a legitimate medical purpose." *Id.* at 7075.  Regarding violation of the "corresponding responsibility," the jury instruction stated:

> A violation of the corresponding responsibility occurs when a person knowingly fills or allows to be filled an illegitimate prescription. In this context, knowingly includes when a person acts with deliberate ignorance or willful blindness to information in their possession.

11/15/21 Trial Tr. at 7075-76 (Doc. #: 4153).

Further, regarding evidence of knowledge or intent, the Court informed the jury that certain settlement agreements between Defendants and the DEA could be considered for a "limited purpose" – that is, the jury could consider these settlements only to the extent the jury believed they tended to show the Defendant's intent, or what notice or knowledge the Defendant received as a result of the settlements.  *Id.* 7073.  Regarding the settlements, the Court instructed: "You may

---

[3] The Court instructed the jury:

> Unlawful conduct can occur either by acting in a certain way that is prohibited by law, or by failing to act in a certain way that is required by law.  Specifically, unlawful conduct occurs when a person engages in conduct that is prohibited by a statute, ordinance, or regulation that controls safety.  And unlawful conduct also occurs when a statute, ordinance, or regulation that controls safety requires a person to engage in certain conduct, but the person fails to do so.
>
> ***
>
> Conduct that is fully authorized by a statute, ordinance, or regulation cannot create a public nuisance because it is lawful conduct.  But if a person's conduct does not comply with what is authorized by law, then that conduct may be unlawful conduct.

11/15/21 Trial Tr. at 7074 (Doc. #: 4153).

not infer liability or draw any conclusions about a defendant's potential liability in this case based on the fact that it entered into one of those settlements." *Id.*

As set forth below, the evidence introduced at trial was sufficient for a jury to reasonably conclude Plaintiffs demonstrated that each Defendant knowingly engaged in unlawful dispensing conduct.[4]

### 1.  CVS

CVS contends the evidence is insufficient for a jury to find CVS acted unlawfully. Specifically, CVS maintains evidence concerning DEA and Ohio Board of Pharmacy inspections "demonstrated that the CVS pharmacies in Lake and Trumbull Counties were normal pharmacies that were dispensing prescription opioids in a lawful manner to serve their patients' needs." CVS Motion at 4-6 (Doc. #: 4207).  CVS also insists there is no evidence to show CVS acted unlawfully at the corporate level or at the store-level in the Counties.  *Id*. at 6-11.  CVS further argues that, because it fully complied with its legal and regulatory obligations, it is entitled to safe harbor immunity from nuisance liability.  *Id*. at 4-6.

#### a.  CVS's Policies and Compliance

Plaintiffs had the burden to prove that CVS failed to take adequate measures to avoid diversion of prescription opioids.  Evidence introduced at trial was sufficient for a reasonable jury to conclude that Plaintiffs carried this burden.

---

[4] Walmart and CVS argue that "Plaintiffs cannot rely on the mental states of disparate employees who played no role in the transaction or conduct in question."  Walmart Motion at 4 (Doc. #: 4203); *see also* CVS Motion at 6-7 (Doc. #: 4207).  Under Ohio law, knowledge coming to an employee on a matter within the scope of her authority is imputed to the corporation.  *See Levin v. Penn. R.R. Co.*, 73 N.E.2d 102, 105 (Ohio Ct. App. 1946); *Hometown Health Plan v. Aultman Health Found.*, No. 2006 CV 06 0350, 2009 WL 1806759, at *7 (Ohio Com.Pl. Apr. 15, 2009).  Here, the evidence demonstrating Defendants' knowledge easily meets this standard – that is, the evidence shows knowledge by employees who were acting "within the scope of their authority."  *Levin*, 73 N.E.2d at 105.

At trial, Plaintiffs presented evidence demonstrating that CVS, both at the corporate level and in the field, was aware of its corresponding responsibility and the importance of resolving red flags before dispensing opioids. Kenneth Cook, CVS Pharmacist and District Leader, stated: "Corresponding responsibility . . . to me it starts with a definition is [sic] when a patient presents a prescription for a controlled substance, you know, resolving any red flags that are discovered prior to that medication ultimately reaching the hands of the public."[5]  And Michelle Travassos, CVS Manager of Pharmacy Professional Services, agreed that "every red flag that a pharmacist identifies with a prescription must be resolved before the pharmacist can fill the prescription."[6]

The jury also heard evidence that, despite its knowledge of these obligations, CVS **knew** it did not have sufficient policies in place to ensure compliance.  CVS makes much of the numerous policies and systems that it contends demonstrate compliance.  *Id.* at 7-11.  Although the jury heard evidence about these policies, it also heard evidence indicating the policies were incompletely implemented and otherwise inadequate.  For example, Travassos testified that a CVS program to "alert pharmacists when there's a red flag and stop them from filling the prescription until they document the resolution of that flag" had not yet been implemented as late as August 2020.[7]  Indeed, CVS policies did not even begin to mention red flags until 2010.[8]  Travassos also testified that she was "unaware" whether CVS had a policy requiring pharmacists to document or inform corporate headquarters of "refusals to fill," *i.e.* patient interactions in which a pharmacist refuses

---

[5] 11/8/21 Trial Tr. at 6537:18-22 (Doc. #: 4132) (Cook).

[6] 10/26/21 Trial Tr. at 4046:21-24 (Doc. #: 4090) (Travassos); 11/3/21 Trial Tr. at 5742:24-5743:1 (Doc. #: 4115) (Nicole Harrington, CVS Senior Director of Pharmacy) (emphasizing the importance of identifying and resolving red flags).

[7] 10/26/21 Trial Tr. at 4057:17-4058:6 (Doc. #: 4090) (Travassos).

[8] 11/3/21 Trial Tr. at 5793:25-5794:12 (Doc. #: 4115) (Harrington).

to fill a suspicious opioid prescription, but then simply returns the prescription to the customer, who is presumably free to try to fill it elsewhere.[9]

Thomas Davis, CVS Vice President of Pharmacy Professional Services, testified about RxConnect, a computer system CVS provides to its pharmacists.  Davis stated, "We've given them the RxConnect pharmacy system, which has all the information from a data perspective that they would need to exercise corresponding responsibility."[10]  But Cook testified that, even in the present, more advanced iteration of RxConnect, the system does not give pharmacists known information about the company's investigations into suspicious prescribers, its analysis of store dispensing habits, or whether prescribers are top volume prescribers for hydrocodone or oxycodone.[11]

The jury also heard evidence highlighting CVS's failure to consistently enforce and monitor compliance with its own policies.  For example, Nicole Harrington, CVS Senior Director of Pharmacy, admitted that it is "common" for pharmacists to not document the resolution of red flags, even though CVS policy required pharmacists to "document all steps."[12]  These examples provide evidence from which the jury could have reasonably concluded CVS knew it was not complying with its legal obligations to control diversion.

Plaintiffs adduced additional evidence that CVS entered into a settlement agreement with the DEA arising out of investigations into CVS's controlled substances dispensing policies and practices in Florida.  In that agreement, CVS acknowledged that certain of its stores dispensed

---

[9] 1/26/21 Trial Tr. at 4052:8-4053:7 (Doc. #: 4090) (Harrington).

[10] 10/5/21 Trial Tr. at 388:12-21 (Doc. #: 3995) (Davis).

[11] 11/8/21 Trial Tr. at 6578:17-25 (Doc. #: 4132) (Cook).

[12] 11/3/21 Trial Tr. at 5742:16-19; 5895:17-19 (Doc. #: 4115) (Harrington).

controlled substances "in a manner not fully consistent with their compliance obligations" under the CSA.[13]  Although the settlement agreement did not involve dispensing practices in stores in the Counties, Harrington testified that the corporate policies that led to those practices were national in scope.[14]

What is more, the jury heard testimony that the effectiveness of CVS's diversion control policies and systems was undermined by other policies that provided incentives for pharmacists to cut corners in performing and documenting due diligence.  For example, CVS had a compensation policy that rewarded pharmacists for filling prescriptions within fifteen minutes.  Expert witness Carmen Catizone, a national expert on pharmacy practice and regulation,[15] opined that this incentive policy rewarding speed was pernicious as applied to the dispensing of opioids, because it put patients at risk.  He opined that fifteen minutes does not typically give a pharmacist time to properly resolve a red flag.  "The only prescriptions you could probably fill in 15 minutes or less [without regard to red flags] are maintenance medications that patients have been on for a while, medications for high blood pressure, diabetes, some other disease . . . ."[16]  From this evidence, the jury could have reasonably concluded that CVS was on notice of the deficiencies in its controlled substances dispensing policies.

b.  *The McCann – Catizone Analysis*

Expert testimony also showed the inadequacy of CVS's controls against diversion. Dr. Craig McCann, a data expert, testified that, of the 701,467 opioid prescriptions that CVS

---

[13] Pls. Ex. P-8954 at 3 (Doc. #: 3999-7).

[14] 11/3/21 Trial Tr. at 5875:22-25; 5876:14-16 (Doc. #: 4115) (Harrington).

[15] Catizone practiced as a pharmacist for over 20 years and served for 22 years as Executive Director of the National Association of Boards of Pharmacy.  *See* CT3 Daubert Order re Catizone at 1 (Doc. #: 3947).

[16] 10/08/21 Trial Tr. at 1125:2-1126:20 (Doc. #: 4008) (Catizone).

dispensed in Lake and Trumbull Counties between 2006 and 2019, over 20 percent, or 141,651 prescriptions, had red flags for diversion, as identified by Catizone, that ought to have been resolved prior to dispensing.[17]

Catizone further testified he analyzed a random sample of 2,000 opioid prescriptions dispensed by CVS that had at least one red flag for diversion.[18]  For each prescription, Catizone inspected both the digital records entered by pharmacists and the physical copy of the prescription, to see whether the pharmacist had documented any due diligence efforts to resolve the red flag(s).[19] Catizone offered his expert opinion that some 90 percent of the red-flag prescriptions in his overall sample set (which included approximately 2,000 red-flag prescriptions from each defendant) lacked adequate documentation to indicate the pharmacist had identified and resolved the red flag before dispensing.[20] Dr. McCann, in turn, opined that Catizone's determination that 90 percent of the sample set was inadequately documented could be extrapolated to the entirety of red-flag prescriptions that Catizone had identified, *i.e.* including approximately 90 percent of the 141,651 red-flag prescriptions dispensed by CVS.[21]

---

[17] 10/15/21 Trial Tr. at 2231:17-2232-5; 2233:17-20 (Doc. #: 4032) (McCann).

[18] For each prescription, CVS's computer system includes so-called "notes fields" in which pharmacists can document any due diligence they may have conducted with respect to the red flags.  Because pharmacists sometimes document these efforts on the hard copy of the prescription, Catizone also physically examined each of the prescriptions in the sample.  10/8/21 Trial Tr. at 1150:11-1153:6 (Doc. #: 4008) (Catizone).

[19] Catizone found that, of the 2,000 sample red-flag prescriptions dispensed by CVS, almost half, or 950 prescriptions, had no relevant entry in the digital notes fields.  Of those, Catizone found that 686 prescriptions also had no red flag due diligence written on the physical prescription.  10/8/21 Trial Tr. At 1150:11-1153:6 (Doc #: 4008) (Catizone).  Of the 1,050 prescriptions that did have entries in the digital notes fields, Catizone stated the "overwhelming majority . . . did not appropriately document the existence [and resolution] of red flags . . . as required by standards of care and requirements."  *Id.* at 1155:9-19.

[20] 10/8/21 Trial Tr. at 1202:23-1203:3 (Doc. #: 4008) (Catizone).

[21] 10/14/21 Trial Tr. at 2168:4-2170:17 (Doc. #: 4026) (McCann).   Specifically, McCann stated that, as to the entire sample set (totaling approximately 7800 red-flag prescriptions from multiple defendants), Catizone's determination that 90 percent were inadequately documented could be extrapolated to the entire set of red-flag prescriptions identified by Catizone (totaling approximately 616,000 prescriptions for all defendants) to a range of 87 to 93 percent, with a confidence level of 95 percent.  *Id.*

In addition to presenting evidence of CVS's consistent failure to comply with its legal requirements, Plaintiffs demonstrated that CVS dispensed massive quantities of prescription opioids between 2006 and 2019: 15,977,215 dosage units in Trumbull County and 25,528,782 dosage units in Lake County.[22]

Defendants adduced evidence attacking the bases for Catizone's and McCann's testimony, methodology, and conclusions, which the jury weighed. Having reviewed all of the evidence, the Court concludes the jury had a reasonable basis to find that CVS knowingly engaged in unlawful conduct by dispensing opioids without effective controls and procedures to guard against diversion.

      c.    *Safe Harbor Immunity*

In the face of this evidence, CVS maintains it should be entitled to the protection of "safe harbor" immunity from liability because there was no evidence that either the DEA or the Ohio Board of Pharmacy ("BOP") "ever revoked or suspended the licenses" of any of its pharmacies or "expressed any concerns about those pharmacies' dispensing of prescription opioid medications." CVS Motion at 5 (Doc. #: 4207).

In its *Track Three* Order denying the Pharmacy Defendants' motion to dismiss, the Court addressed the question of safe harbor immunity and considered whether regulatory inspections were sufficiently thorough to confer such immunity.  The Court ruled that, under Ohio law, "'safe harbor' immunity from absolute nuisance liability is available only to those who perform in accordance with their applicable licensing and regulatory obligations."  CT3 MTD Order at 29-30

---

[22] Pls. Ex. 26319-A at 1 (Doc. #: 4046-14).

11

(Doc. #: 3403)[23] (citing Bakers MTD Order at 45-47 (Doc. #: 3177)).[24]  In addressing a similar argument made by Giant Eagle in its summary judgment motion, the Court concluded:

> the ultimate determination of whether a defendants' compliance was substantial, or whether it falls somewhere short of that mark, is best left to a jury.  In the end, it will be for the factfinder to determine how much weight to give the [defendants'] DEA and OBOP inspections and how much weight to give Plaintiffs' evidence that, despite those inspection results, the [defendants], in fact, violated their statutory duties to guard against diversion.

CT3 GE MSJ Order at 6 (Doc. #: 3913).[25]

The jury heard evidence that Ohio BOP inspections of CVS pharmacies were brief, cursory, and infrequent, lasting two and a half to three hours and occurring every year or two for each store. When asked whether he looked at CVS policies for dispensing controlled substances to "determine whether or not they conformed with your understanding of either the federal Controlled Substances Act or the state regulations," retired Ohio BOP agent George Pavlich stated, "I don't recall looking at those policies."[26]  Ohio BOP agent Trey Edwards also testified he did not review pharmacy policies for dispensing controlled substances.[27]  Edwards confirmed that his inspections did not include any systematic or regular review of individual prescriptions to check whether pharmacies were resolving red flags.[28]  The Ohio BOP inspections were generally directed at other principal concerns, such as physical security.

Put simply, given the nature of the DEA and Ohio BOP's inspections, the fact that CVS passed those inspections does not establish it was in substantial compliance with all of its legal

---

[23] *In re Nat'l Prescription Opiate Litig.,* 477 F.Supp.3d 613, 634 (N.D. Ohio 2020).

[24] *In re Nat'l Prescription Opiate Litig.*, 440 F. Supp. 3d 773, 808 (N.D. Ohio 2020).

[25] *In re Nat'l Prescription Opiate Litig.,* 2021 WL 3917174, at *3 (N.D. Ohio Sept. 1, 2021).

[26] 10/28/21 Trial Tr. at 4652:13-17 (Doc. #: 4106) (Pavlich).

[27] 11/2/21 Trial Tr. at 5412:15-5413:4 (Doc. #: 4111) (Edwards).

[28] 11/2/21 Trial Tr. at 5414:14-19 (Doc. #: 4111) (Edwards).

obligations under the CSA and its Ohio analog, and a jury could reasonably conclude otherwise. Accordingly, CVS is not entitled to safe harbor immunity as a matter of law.

### 2. Walgreens

Similarly, Plaintiffs introduced evidence sufficient to show that Walgreens engaged in unlawful conduct by failing to take adequate measures to avoid diversion of prescription opioids. The Court reviews a sampling of such evidence below.

#### a. *Walgreens' Policies and Compliance*

The evidence showed that Walgreens had a poor record of compliance with its anti-diversion obligations.  For example, a Walgreens document indicated that, as of 2010, retail employees received no periodic training for dispensing controlled substances.[29]  Moreover, Walgreens was aware of its obligation to ensure that its pharmacists documented the resolution of red-flag prescriptions. A 2018 document setting out Walgreens' policy on "Good Faith Dispensing" stated: "It is imperative that pharmacists document all efforts used to validate good faith dispensing."[30]  And Natasha Polster,[31] Walgreens Divisional Vice President of Pharmacy Compliance Patient Safety, testified that, since at least 2012, it has been "an obligation of the pharmacist to document the resolution of red flags on prescriptions."[32]

Despite these explicit policies, however, the jury also heard evidence that Walgreens pharmacists regularly did not document the resolution of red flags, and that Walgreens was aware

---

[29] Pls. Ex. P-19566 at 1 (Doc. #: 4094-15).

[30] Pls. Ex. P-15068 at 5 (Doc. #: 4036-8).

[31] Shortly after Ms. Polster (who shares the same last name with the District Judge) took the witness stand, the Court confirmed that Ms. Polster and the District Judge had never met and, to the best of their knowledge, were not related. 10/19/21 Trial Tr. at 2837:7-24 (Doc. #: 4050) (Polster).

[32] 10/19/21 Trial Tr. at 2873:1-3, 2880:2-3 (Doc. #: 4050) (Polster).

its pharmacists were not complying with the requirements of its own Good Faith Dispensing policy. For example, pharmacist Amy Stossel testified on cross-examination that she regularly did not take the time to document her resolution of red flags. She stated that time constraints prevented her from doing so, noting there are never two pharmacists working a shift at her pharmacy at the same time.[33] Similarly, Polster testified that, as of 2012, Walgreens had a bonus program that rewarded pharmacy staff based, in part, on the number of opioid prescriptions they dispensed.[34] Specifically, this program provided financial incentives for pharmacists to fill more prescriptions than they had in the prior year, taking into account the total number of prescriptions filled, including prescriptions for controlled substances.[35]

In addition, Plaintiffs introduced a memorandum of agreement that Walgreens entered into with the DEA in 2013, under which Walgreens agreed to significant enhancements in its controlled substances policies.[36] A 2014 internal audit to investigate whether Walgreens pharmacies were adhering to these enhanced policies,[37] however, revealed that 59 percent of its stores were not in compliance with relevant aspects of the Good Faith Dispensing Policy.[38] The audit further found that some 35,000 Walgreens employees had not timely completed their Good Faith Dispensing training.[39]

---

[33] 11/9/21 Trial Tr. at 6991:21-24, 7008:10-22 (Doc. #: 4133) (Stossel).

[34] 10/19/21 Trial. Tr. at 2866:1-7 (Doc. #: 4050) (Polster).

[35] 10/19/21 Trial. Tr. at 2866:20-2867:13 (Doc. #: 4050) (Polster).

[36] Pls. Ex. P-00015 (Doc. #: 4029-35); 10/20/21 Trial Tr. at 3021:14-3022:9 (Doc. #: 4057) (Polster).

[37] 10/20/21 Trial Tr. at 3043:19-3046:9 (Doc. #: 4057) (Polster).

[38] 10/20/21 Trial Tr. at 3045:12-3047:12 (Doc. #: 4057) (Polster) (employees failed to complete good faith compliance checklist when dispensing certain targeted opioid prescriptions).

[39] 10/20/21 Trial Tr. at 3063:8-11 (Doc. #: 4057) (Polster).

The jury also heard about other Walgreens policies that suggested its diversion control policies were inadequate.  For example, in response to a juror's question, Stossel testified that, in cases where a pharmacist refused to fill a patient's prescription for opioids, Walgreens' policy was to return the prescription to the patient without scanning and entering it into the computer system.[40] This would allow the customer to try his luck at another Walgreens store or return to the same store when another pharmacist is on duty.

Based on this evidence, the jury could reasonably have concluded Walgreens failed to implement effective controls against diversion.  Additionally, Plaintiffs introduced Catizone's analysis showing that Walgreen's documented red-flag prescriptions inadequately.

### b.  The McCann – Catizone Analysis

The jury heard expert testimony from Dr. McCann and Catizone relating the findings of their analysis of red-flag prescriptions dispensed by Walgreens.  Dr. McCann testified that, of the 806,193 opioid prescriptions that Walgreens dispensed in the Counties between 2006 and 2020, 175,609 prescriptions had at least one red flag that should have been resolved.[41]  Employing the same analysis described in § I.A.1.b, *supra*, Catizone testified that, from his random sample of 2,000 red-flag opioid prescriptions dispensed by Walgreens, over 60 percent, or 1,237 prescriptions, had no relevant entries in any notes field.[42]  Of these, 940 prescriptions also had nothing written on the hard copy.[43]  Catizone told the jury that his physical inspection of the hard-copy prescriptions revealed that, even when he found written notes, they contained no significant

---

[40] 11/9/21 Trial Tr. at 7006:9-7008:4 (Doc. #: 4133) (Stossel).

[41] 10/15/21 Trial Tr. at 2238:16-19; 2246:11 (Doc. #: 4032) (McCann).

[42] 10/8/21 Trial Tr. at 1182:12-1183:3 (Doc. #: 4008) (Catizone).

[43] 10/8/21 Trial Tr. At 1183:4-22 (Doc. #: 4008) (Catizone).

documentation of due diligence.[44]  As noted above, Catizone concluded that, overall, 90 percent of the entire red-flag sample set lacked adequate documentation to show the pharmacist had identified and resolved the red flag before dispensing.[45]  Further, Dr. McCann testified this estimation could be extrapolated to the entire set of red-flag opioid prescriptions identified by Catizone,[46] including approximately 90 percent of the 175,609 red-flag prescriptions dispensed by Walgreens.

Further, Plaintiffs adduced evidence that between 2006 and 2019, Walgreens' pharmacies dispensed a total of 25,346,069 dosage units of prescription opioids in Lake County, and 27,969,541 dosage units in Trumbull County.[47]

Again, having reviewed the evidence, the Court concludes the jury had a reasonable basis to find that Walgreens knowingly engaged in unlawful conduct by dispensing opioids without effective controls and procedures to guard against diversion.

### 3.    Walmart

Evidence introduced at trial also showed that Walmart engaged in unlawful conduct by failing to take effective measures to avoid the diversion of prescription opioids.

#### a.  Walmart's Policies and Compliance

Walmart knew it was required to resolve red flags before dispensing opioids.  Susanne Hiland, Walmart Senior Director for Patient Safety, testified that Walmart policies direct

---

[44] 10/8/21 Trial Tr. At 1183:4-22 (Doc. #: 4008) (Catizone).

[45] 10/8/21 Trial Tr. at 1202:23-1203:3 (Doc. #: 4008) (Catizone).

[46] 10/14/21 Trial Tr. at 2168:4-2170:17 (Doc. #: 4026) (McCann).

[47] Pls. Ex. 26321 at 1 (Doc. #: 4036-3).

"pharmacists that if they identify a red flag, they should resolve the red flag before dispensing the medication."[48]  Additionally, a Walmart policy document entered into evidence states: "pharmacist[s] must use professional judgment to resolve all red flags prior to dispensing a controlled substance prescription" and the "results of the red flag evaluation" are to be documented in the "Rx Notes field" of a Walmart system called Connexus,[49] which is Walmart's "work flow management system" that "processes [prescriptions] and moves [them] through all of the different stations" prior to dispensing.[50]

Despite this knowledge, there was evidence that Walmart knew it did not have sufficient policies in place to ensure compliance.  For example, an email sent to Brad Nelson, former Walmart Senior Manager for Controlled Substances, from C. Scott Ortolani, a Walmart Market Director, describes a conversation that Ortolani had with an inspector who voiced concerns that Walmart's "more liberal policies on dispensing pain meds" were making Walmart a "funnel" for Schedule II controlled substances such as opioids.[51]  Nelson also testified he was not aware of Walmart having any systems that would show pharmacists at one store if a customer's opioid prescription had previously been rejected as illegitimate at another Walmart store.[52]

Additionally, Plaintiffs adduced evidence from which the jury could have reasonably concluded that Walmart policies were not only insufficient, but also were not timely or effectively implemented.  Specifically, Hiland testified that an internal system known as Archer, "a computer program that Walmart uses to log compliance activity from the stores," was not made available to

---

[48] 11/1/21 Trial Tr. at 5201:21–23 (Doc. #: 4109) (Hiland).

[49] Walmart's Ex. WMT-MDL-00134 at 3 (Doc. #: 4128-10).

[50] 11/1/21 Trial Tr. at 5082:8–9 (Doc. #: 4109) (Hiland).

[51] Pls. Ex. P-20829 at 001 (Doc. #: 4055-16).

[52] 10/25/21 Trial Tr. at 3900:7–13 (Doc. #: 4078) (Nelson).

pharmacists through Connexus until 2015.[53] Hiland further testified that Walmart provided aggregate reporting regarding refusal-to-fill information to company leadership starting in 2011, but failed to "push that down to the stores."[54]

On top of evidence casting doubt on the adequacy and effective implementation of Walmart policies, Plaintiffs also presented evidence regarding whether Walmart sufficiently monitored compliance with its own policies.  For example, Nelson testified: "My job was to communicate the policies and train [employees] about the policies. It was not to enforce that [the policies] were followed."[55]  Nelson so testified even though a key part of his job description was "to drive the company's compliance with federal and state regulatory requirements related to [the handling, distribution, and dispensing] of controlled substances" and to "oversee the company's policies and assessments related to the controlled substances by analyzing state and federal guidelines to ensure the company's programs meet the requirements."[56]

Furthermore, the jury heard testimony demonstrating that the effectiveness of Walmart's diversion control policies and systems was undermined by other policies or corporate incentives. For example, evidence showed Walmart personnel voiced concerns that they were afraid of being terminated for refusing to fill prescriptions, regardless of the presence of red flags.[57]  Other evidence indicated that pharmacists had complained "they don't have time to check all these prescriptions for good faith."[58]

---

[53] 11/1/21 Trial Tr. at 5095:10–11, 5096:23–25 (Doc. #: 4109) (Hiland).

[54] 11/1/21 Trial Tr. at 5248:25–5249:2 (Doc. #: 4109) (Hiland).

[55] 10/25/21 Trial Tr. at 3856:24–25 (Doc. #: 4078) (Nelson).

[56] 10/18/21 Trial Tr. at 2420:16–2421:2 (Doc. #: 4041) (Nelson).

[57] 10/18/21 Trial Tr. at 2572:1–2573:10 (Doc. #: 4041) (Nelson).

[58] Pls. Ex. P-19827 at 002 (Doc. #: 4046-6).

18

### b.  *The McCann-Catizone Analysis*

Expert evidence also showed the inadequacy of Walmart's controls against diversion. Dr. McCann testified that, of the 229,006 opioid prescriptions dispensed by Walmart in the Counties between 2006 to 2018, 37,379 prescriptions had one or more red flags associated with them.[59]  Catizone, again conveying the results of his red flag analysis, testified that of the 1,800 sample red-flag prescriptions dispensed by Walmart, only two prescriptions "contained no information across all relevant comment fields," but "the majority of the information contained in these comment fields would not qualify as adequate or even relevant due diligence."[60]  Catizone also testified that the hard copy notes did not "reflect adequate due diligence."[61]  When cross-examined by counsel for Walmart, Catizone testified he could not "recall a [Walmart] prescription where there was appropriate documentation to the extent that would be required."[62]  As noted above, Catizone determined that 90 percent of the entire sample set contained inadequate documentation of due diligence, and McCann testified this estimate could be extrapolated to the entire set of red-flag opioid prescriptions identified by Catizone, including approximately 90 percent of the 37,379 red-flag prescriptions dispensed by Walmart.[63]

The jury also heard evidence of the sheer volume of opioids that Walmart dispensed in the Counties.  From January 2006 through April 2018, Walmart pharmacies dispensed 9,890,771 dosage units of prescription opioids into Lake County and 5,228,488 dosage units into Trumbull County.[64]

---

[59] 10/15/21 Trial Tr. at 2239:19–22; 2246:12–13 (Doc. #: 4032) (McCann).

[60] 10/8/21 Trial Tr. at 1172:2-10 (Doc. #: 4008) (Catizone).  Catizone further explained that, of the 1,800 prescriptions, 1,639 had no information in the miscellaneous note field and approximately 1,400 had no information in the prescription order detail comment field; these were the two fields he identified as the relevant fields.

[61] 10/8/21 Trial Tr. at 1172:24-1173:1 (Doc #: 4008 (Catizone).

[62] 10/8/21 Trial Tr. at 1243:7-13 (Doc. #: 4008) (Catizone).

[63] 10/14/21 Trial Tr. at 2168:4–2170:17 (Doc. #: 4026) (McCann).

[64] Pls Ex. 26322-A at 1 (Doc. #: 4046-16).

19

Having reviewed the evidence, the Court concludes the jury had a reasonable basis to find Walmart knowingly engaged in unlawful conduct by dispensing opioids without effective controls and procedures to guard against diversion.

### B.       Intentional Conduct

Defendants contend the trial evidence is insufficient to show Defendants engaged in intentional and culpable conduct.  Specifically, Defendants argue Plaintiffs failed to establish that Defendants acted to produce a specific result – namely, "an interference with public heath or safety resulting from the oversupply and diversion of prescription opioids in Lake and Trumbull Counties."  Joint Motion at 13 (Doc. #: 4042).

As the Court instructed the jury, to find a person engaged in intentional conduct, "it is enough that the person intended to act and knew, or was substantially certain, that the circumstances resulting from that act would interfere with public health or public safety."  11/15/21 Trial Tr. at 7072 (Doc. #: 4153).[65]  The Court further instructed: "If a person learns that circumstances resulting from their conduct interfere with public health or public safety, and the person continues that conduct, then the subsequent conduct is intentional."  *Id.* at 7073.

---

[65] The Court instructed the jury:

> Intentional conduct occurs when a person acts with the purpose to produce a result.  A person intends an act when that act is done purposely, not accidently.  The intent with which a person acts is known only to that person.

> There are two ways to prove a person's intentional conduct.  One, when a person expresses their intent to others.  Or two, when a person somehow indicates their intent by their conduct.

> For you to find that a person engaged intentional conduct, it is enough that the person intended to act and knew, or was substantially certain, that the circumstances resulting from that act would interfere with public health or safety.  It is not necessary for you to find that the person intended to cause the nuisance.

11/15/21 Trial Tr. at 7072-73 (Doc. #: 4153).

20

At trial, Plaintiffs presented evidence demonstrating that each Defendant knew prescription opioids were highly addictive and had a high potential for abuse, and that diversion of prescription opioids would likely lead to significant harms in the community.  Further, as discussed above, the evidence also showed that, despite this knowledge, each Defendant dispensed massive quantities of opioids into Plaintiffs' communities without taking necessary steps to protect against diversion. Additionally, the record revealed each Defendant continued this dispensing conduct even after it had notice that diversion of prescription opioids was, in fact, contributing to high numbers of death and addiction.  Based on these facts, as discussed below, a jury could reasonably conclude that each Defendant intentionally dispensed opioids under circumstances which it knew or was substantially certain would interfere with public health or public safety.

### 1.    CVS

Plaintiffs presented evidence demonstrating that CVS well understood the highly addictive nature of opioids and harms that would result from diversion thereof.  Thomas Davis, CVS Vice President of Pharmacy Professional Services, testified that Schedule II drugs, including oxycodone and hydrocodone, have a "high potential for abuse and addiction."[66]  CVS Pharmacist and District Leader Kenneth Cook agreed that opioids are "highly addictive."[67]  Further, Michelle Travassos, CVS Manager of Pharmacy Professional Services, testified that controlled substances are more closely regulated because they have "more risk associated with misuse," including risk of diversion.[68]  As Travassos put it, "Anytime an opioid is used for something it's not intended to be

---

[66] 10/5/21 Trial Tr. at 335:13-336:1 (Doc. #: 3995) (Davis).

[67] 11/8/21 Trial Tr. at 65614 at 17-18 (Doc. #: 4132) (Cook).

[68] 10/25/21 Trial Tr. at 3965:5-11 (Doc. #: 4078) (Travassos).

used for [it] could be a risk to the public."[69]

Despite this knowledge, the evidence demonstrated that CVS dispensed massive quantities of prescription opioids without implementing effective policies to guard against diversion, and even implemented policies incentivizing its pharmacists to cut corners to save time.  *See* § I.A.1, *supra* (CVS's dispensing conduct).  Further, the evidence showed CVS's conduct continued even after it understood the devastating harm to public health and safety.  For instance, in 2015, Nicole Harrington, CVS Senior Director of Pharmacy, presented a power point presentation stating that 52 million people over the age of 12 had used prescription drugs nonmedically, and that prescription drugs were killing more people than cars, guns, and falls.[70]  Yet the evidence at trial showed that, even as late as August of 2020, CVS's policies to ensure compliance were incomplete or inadequate.  *See* § I.A.1, *supra* (CVS's dispensing conduct).  Construed in the light most favorable to Plaintiffs, this evidence easily supports a conclusion that CVS intentionally dispensed opioids under circumstances it knew or was substantially certain would interfere with public health or public safety.

### 2.    Walgreens

Likewise, the evidence showed that Walgreens was well aware of harmful risks associated with diversion of prescription opioids.  For instance, in 2010, Natasha Polster, Walgreens' Divisional Vice President of Pharmacy Compliance Patient Safety, circulated an internal email with information stating, *inter alia*: "The abuse of prescription drugs, especially controlled

---

[69] 10/25/21 Trial Tr. at 3965:24-25 (Doc. #: 4078) (Travassos).

[70] 11/3/21 Trial Tr. at 5768:33-5769:19 (Doc. #: 4115) (Harrington).

substances, is a serious social and health problem in the United States."[71]  Further, Polster testified that, in 2013, she was aware of and speaking with the market leadership team about "the problems with opiates."[72]

During this same time, Walgreens knew of severe public harm occurring as a result of diversion.  In 2013, Polster noted in a national power point presentation that prescription pain abuse was the leading cause of accidental death in the United States.[73]  As described by Brian Joyce, former Walgreens District Manager over six stores in Trumbull County: "without question, every pharmacy in the State of Ohio was well-aware of the opioid problem in every city, county, 'burb in the state."[74]  Nevertheless, in the midst of this knowledge, the evidence showed Walgreens continued to dispense millions of dosage units of prescription opioids without implementing effective controls against diversion, including not allowing their pharmacists sufficient time to document red flags.  *See* §I.A.2, *supra* (Walgreens' dispensing conduct).  Based on this evidence, the jury could reasonably find that Walgreens intentionally dispensed opioids under circumstances it knew or was substantially certain would interfere with public health or public safety.

### 3.  Walmart

The evidence also established that Walmart knew of the dangers associated with diversion of prescription opioids.  At trial, Brad Nelson, former Walmart Senior Manager for Controlled Substances, acknowledged that, in 2011, a drug abuse epidemic was raging across the country that

---

[71] 10/19/21 Trial Tr. at 2888:2-13 (Doc. #: 4050) (Polster).

[72] 10/19/21 Trial Tr. at 2907:15:20 (Doc. #: 4050) (Polster).

[73] 10/19/21 Trial Tr. at 2908:11-2909:3 (Doc. #: 4050) (Polster).

[74] 10/13/21 Trial Tr. at 1879:9-15 (Doc. #: 4023) (Joyce).

included opioids. Specifically, Nelson stated: "And unfortunately, prescription medications were misused at times which contributed to a drug abuse epidemic. And opioids are certainly one of those items that was misused."[75] Also, Susanne Hiland, Senior Director for Walmart Patient Safety, testified that, in 2013, Walmart conveyed a message to its pharmacists stating, *inter alia*: "the abuse of controlled substances in the U.S. has increased significantly and at a concerning rate over the past ten years."[76]

In fact, the evidence showed that, in 2012 and 2013, Walmart learned of circumstances suggesting its pharmacies had "liberal" dispensing policies for pain meds and were becoming "funnels" or pharmacies "of choice" for pill mills.[77] Despite this information, the evidence demonstrated that Walmart continued to dispense high volumes of opioids with policies that were insufficient or not timely or effectively implemented to prevent diversion. *See* §I.A.3, *supra* (Walmart's dispensing conduct). Construed in the light most favorable to Plaintiffs, this evidence supports an inference that Walmart's conduct was intentional, that is, that Walmart knew or was substantially certain that its conduct would result in oversupply and diversion and cause harm to the public's health and safety. Accordingly, the jury's verdict is well supported on this ground.[78]

---

[75] 10/18/21 Trial Tr. at 2471:12-2472:12 (Doc. #: 4041) (Nelson).

[76] 11/1/21 Trial Tr. at 5110:11-5112:10 (Doc. #: 4109) (Hiland); *see also* 11/8/21 Trial Tr. at 6626:16-20 (Doc. #: 4132) (Demetra Ashley, former DEA Investigator, testifying that any registrant, including the Defendants, "knew or should have known of the raging epidemic in opioid prescription pills from the early 2000s on").

[77] 11/1/21 Trial Tr. at 5239:11-5240:4 (Doc. #: 4109) (Hiland testifying that, in 2012, Walmart learned one of its pharmacies had lines forming for scripts two hours before it opened; the ensuing investigation discovered a high number of prescriptions for oxycodone and provided an opportunity for Walmart to "mitigate the risk of our pharmacies becoming the pharmacy of choice for pill mills"); Doc. #: 4041 at 2507:20-2508:5 (in 2013, Nelson received an email reporting that "the inspectors collectively feel Walmart is starting to become a funnel with C-IIs due to [its] more liberal policy on dispensing pain meds").

[78] Defendants assert their conduct was lawful and, therefore, cannot be penalized. Joint Motion at 13-15 (Doc. #: 4042). The Court rejects this argument for the reasons discussed *supra*, § 1.A.1 (CVS "safe harbor" argument).

### C.     Causation

Defendants next assert the trial evidence does not support a finding of causation – the jury could not reasonably determine each Defendant's conduct proximately caused a public nuisance in the Counties.  Specifically, Defendants contend the evidence is insufficient because Plaintiffs failed to show: (1) any Defendant filled specific prescriptions that were, in fact, illegitimate or diverted; or (2) the dispensing conduct of each Defendant was a substantial factor in creating the nuisance.[79]

### 1.     Specific Prescriptions

Defendants contend the verdict is unsupported because Plaintiffs failed to present evidence of specific prescriptions filled by Defendants that were actually illegitimate or diverted.[80]  This argument ignores the aggregate nature of the evidence presented at trial and the natural inferences allowed therefrom. The Court previously found aggregate evidence of massive increases in the supply of prescription opioids, combined with evidence demonstrating failures by each Defendant to maintain effective controls against diversion, supported a reasonable inference that Defendants' conduct was a substantial factor in creating the alleged nuisance.  CT1 Causation MSJ Order at 8 (Doc. #: 2561).[81]  Under this evidentiary model, proof of specific prescriptions is not necessary. As discussed above, the trial evidence demonstrated each Defendant failed to maintain effective

---

[79] Joint Motion at 15-24 (Doc. #: 4202); Walmart Motion at 12-15 (Doc. #: 4203); Walgreens Motion at 8-11 (Doc. #: 4206); CVS Motion at 13-17 (Doc. #: 4207).

[80] Joint Motion at 16-17 (Doc. #: 4202); Walmart Motion at 13-14 (Doc. #: 4203); Walgreens Motion at 8 (Doc. #: 4206): CVS Motion at 13-14 (Doc. #: 4207).

[81] *In re Nat'l Prescription Opiate Litig.,* 2019 WL 4178617, at *2 (N.D. Ohio Sept. 3, 2019).

controls against diversion.[82]  Additionally, the evidence showed each Defendant dispensed increasingly large quantities of prescription opioids in the Counties,[83] which corresponded with huge increases in addiction and other health and safety issues in their communities.[84]  This evidence amply supports the jury's finding that the dispensing conduct of each Defendant contributed to creating the nuisance.

## 2.    Substantial Factor

Defendants also assert their individual dispensing conduct was too immaterial to be a "substantial factor" in causing the nuisance, arguing each Defendant had only a small market share in the Counties and played a "remote role" in the supply chain.[85]  Determining the significance of each Defendant's dispensing conduct, however, was a question properly left to the jury.  *See* CT1

---

[82] *See also* 10/07/21 Trial Tr. at 1006:19-25 (Doc. #: 4005) (Catizone) ("Each defendants' local stores filled thousands of prescriptions presenting red flags without evidence of resolving those red flags."); *id.* at 1054:12-17 ("dispensing red flag prescriptions, without conducting adequate investigation or due diligence, is likely to lead to diversion").

[83] *See e.g.,* Pls. Ex. 26321 at 3 (Doc. #: 4036-3) (from 2006 to 2011, the average annual per capita dosage units of Oxycodone and Hydrocodone dispensed by Walgreens increased from 2.64 to 9.64 in Lake County, and from 1.54 to 10.87 in Trumbull County); Pls. Ex. 26322-A at 2 (Doc. #: 4046-16) (from 2006 to 2011, the average annual per capita dosage units of Oxycodone and Hydrocodone dispensed by Walmart increased from 1.58 to 4.09 in Lake County, and from 0.92 to 1.81 in Trumbull County; further, this number increased to 3.32 in Trumbull County in 2016); Pls. Ex. 26319-A at 2 (Doc. #: 4046-14) (from 2006 to 2012, the average annual per capita dosage units of Oxycodone and Hydrocodone dispensed by CVS increased from 4.53 to 10.92 in Lake County, and from 5.22 to 6.18 in Trumbull County).

[84] *See, e.g.,* 10/06/21 Trial Tr. at 499:7-10 (Doc. #: 4000) (Lembke) ("the oversupply of addictive substances is the major contributor to people getting addicted to that substance"); *id.* 521:16-22, 544:23-25 (increased prescribing led to increased supply and exposure, which resulted in increased rates of addiction and overdose death); *id.* 590:7-9 ("so many opioids flooded our society that opioids became easily and widely available to people who hadn't gotten the prescriptions themselves"); *id.* 632:13-19 ("that paradigm shift in prescribing and dispensing led to the oversupply, which led to all kinds of people having easy access to opioids, which led to people getting addicted and dying). *See also* 10/22/21 Trial Tr. at 3664:10-19 (Doc. #: 4065) (Keyes) (after examining the supply of prescription opioids to Lake and Trumbull Counties, Keyes concluded the increases in harms in the Counties "increased in concert with the increase in the supply of prescription opioids").

[85] Joint Motion at 16-17 (Doc. #: 4202); Walmart Motion at 12-13 (Doc. #: 4203); Walgreens Motion at 8-11 (Doc. #: 4206); CVS Motion at 14-17 (Doc. #: 4207).

Small Distributors MSJ Order at 5 (Doc. #: 2559)[86] ("even a very small proportional contribution by one of numerous defendants could equate with a rather large and substantial absolute quantity, both in monetary terms and in terms of the consequent harms").

> As the Court instructed the jury:
>
> An individual defendant's conduct need not be independently capable, all by itself, of causing the public nuisance.  There may be multiple causes of a public nuisance. The fact that some other cause or causes combined with the defendant's conduct in creating the public nuisance does not relieve that defendant from liability if the plaintiff can prove that the conduct the defendant engaged in was a substantial factor in creating the public nuisance.
>
> A defendant's conduct is substantial if a reasonable person would regard that conduct as the cause, or one of the material, meaningful, or considerable causes, of the nuisance. If you find that the conduct of any defendant proximately caused a public nuisance, it is not a defense to liability that some other entity may also be to blame.

11/15/21 Trial Tr. at 7077 (Doc. #: 4153).[87]

At trial, the evidence showed each Defendant dispensed millions of prescription opioids in the Counties,[88] and that even a small portion of diverted pills could have a significant impact on opioid-related deaths and harms in the community.[89]  Further, experts described the importance of

---

[86] *In re Nat'l Prescription Opiate Litig.,* 2019 WL 4178588, at *2 (N.D. Ohio Sept. 3, 2019).

[87] The Court further instructed:

> In addition, the plaintiff must show by the greater weight of the evidence that the conduct a defendant engaged in could reasonably be expected to cause an interference with public health or safety.  A defendant does not, however, need to foresee that their conduct would lead to the specific nuisance that occurred.

11/15/21 Trial Tr. at 7077 (Doc. #: 4153).

[88] *See e.g.,* Pls. Ex. 26321 at 1 (Doc. #: 4036-3) (from 2006 to 2019, Walgreens dispensed 25,346,069 dosage units of prescription opioids into Lake County, and 27,969,541 dosage units into Trumbull County); Pls. Ex. 26322-A at 1 (Doc. #: 4046-16) (from 2006 to 2019, Walmart dispensed 9,890,771 dosage units of prescription opioids into Lake County, and 5,228,488 dosage units into Trumbull County); Pls. Ex. 26319-A at 1 (Doc. #: 4046-14) (from 2006 to 2019, CVS dispensed 25,528,782 dosage units of prescription opioids into Lake County, and 15,977,215 dosage units into Trumbull County).

[89] *See, e.g.,* Murphy Testimony (Doc. #: 4118) at 6020:4-6021:1 (discussing peer-reviewed study showing that, in adjusted models, "a one-pill increase in per capita pill volume was associated with a .2 percent increase in opioid-

the pharmacies' role as the "last stop" or "last line of defense" to ensure that prescriptions are correct and patients are not harmed.[90] This evidence amply supports the jury's conclusion that the conduct of each Defendant played a substantial role in creating the nuisance.

Defendants contend many independent and intervening factors contributed to the nuisance, making Defendants' role "far too remote for liability." Joint Motion at 19 (Doc. #4202). Defendants point to other potentially contributing causes, including opioid manufacturers, opioid distributors, governmental entities, prescribing doctors, illicit opioids, and criminal acts.[91] However, none of these potential causes shifts Defendants' independent responsibility to take effective measures to prevent diversion, or otherwise mandates a verdict for Defendants as a matter of law. *See, e.g.,* CT3 MTD Order at 30-32 (Doc. #: 3403) (finding "the learned intermediary doctrine is wholly inapplicable here"). In other words, as a matter of law and a matter of fact, the existence of other possible causation factors did not preclude the jury from determining that the conduct of each Defendant played a substantial role in creating the nuisance. *See id.* at 32 ("proximate cause is ordinarily a question of fact for the jury"); 11/15/21 Trial Tr. at 7077 (Doc. #: 4153) (jury instruction) ("The fact that some other cause or causes combined with the defendant's conduct in creating the public nuisance does not relieve that defendant from liability

---

related deaths per 100,000 in the population"); 6021:11-25 (the math for this study's finding would equal an association of 24 deaths per one-pill increase in per capita pill volume in the Counties, based on a total of 400,000 people). *See also* Edwards Testimony (Doc. #: 4111) at 5406:10-5407 (from 1999 to 2011, overdose deaths from prescription opioids in Ohio increased 440 percent); 5407 at 12-24 (for each overdose death from prescription opioids in Ohio, there were 10 treatment admissions for abuse, 32 emergency department admissions for abuse, and 130 people who abused or were dependent on prescription painkillers).

[90] *See, e.g.,* Catizone Testimony (Doc. #: 4005) 930:9-16 ("that pharmacist is the last stop, the last person that could actually help that person and make sure the patient is not harmed"); (Doc. #: 4008) at 1204:5-14 (the pharmacist is the last person to safeguard the accuracy and safety of prescriptions). *See also* Hill Testimony at 6466:23-6477:1 (a pharmacist dispensing the drug "is the last line of defense").

[91] Joint Motion at 18-24 (Doc. #: 4202); Walmart Motion at 14-15 (Doc. #: 4203); Walgreens Motion at 10-11 (Doc. #: 4206); CVS Motion at 13-14 (Doc. #: 4207).

if the plaintiff can prove that the conduct of the defendant engaged in was a substantial factor in creating the public nuisance.").  For these reasons, the trial evidence sufficiently supports the jury's causation findings.[92]

## II.       Legal Challenges to Public Nuisance Claims

Defendants assert Plaintiffs' public nuisance claims fail as a matter of law, regardless of the evidence presented at trial.  Joint Motion at 24–45 (Doc. #: 4202).  Defendants raise a number of arguments challenging the legality of Plaintiffs' claims including: (1) the public nuisance claims are precluded by Ohio statutory or common law; (2) the claims are properly based on Defendants' CSA dispensing duties; and (3) assorted legal arguments including lack of standing, the economic loss doctrine, statute of limitations, and improper admission of expert testimony.  The vast majority of these arguments have been previously raised and rejected by this Court.  As set forth below, the Court reaffirms its prior rulings and denies Defendants' Motion for the additional reasons stated.

### A.       Ohio Statutory Law

#### 1.       Ohio Product Liability Act

Defendants contend the Ohio Product Liability Act ("OPLA") abrogates Plaintiffs' public nuisance claims.[93]  Joint Motion at 25 (Doc. #: 4202).  The Court rejected this argument in *Track One*, finding § 2307.71(A)(13) is ambiguous as to whether definition of "product liability claim"

---

[92] CVS also contends the evidence is insufficient to support liability based on its alleged promotional collaboration with Purdue.  *See* CVS Motion at 17-19 (Doc. #:4207).  Plaintiffs' evidence regarding this collaboration was brief and tangential to its case.  The Court need not reach this argument in light of the other evidence supporting CVS's liability.

[93] OPLA § 2307.71(B) states: "Sections 2307.71 to 2307.80 of the Revised Code are intended to abrogate all common law product liability claims or causes of action."  Ohio Rev. Code ("ORC") § 2307.71(B).

includes *all* product-related public nuisance claims, or only those public nuisance claims that also

meet the definitional criteria under the statute.[94]  CT1 MTD Order at 23-28 (Doc. #: 1203).[95]

Following a detailed review of legislative history and relevant case law, the Court determined the

latter and found that, to the extent Plaintiffs did not seek to recover compensatory damages for

"harm,"[96] their public nuisance claims were not abrogated.  *Id.*

Upon careful review, the Court reaffirms its *Track One* holding here.  In so doing, the Court

notes that, on all accounts, the *Track Three* public nuisance claims clearly fall *outside* the scope

of the OPLA. More specifically, under the plain language of § 2307.71(A)(13), to meet the

definitional requirements of a "product liability claim," a cause of action must: (1) be asserted

pursuant to §§ 2307.71 to 2307.80; (2) seek to recover compensatory damages from a manufacturer

or supplier for "harm," meaning "death, physical injury to person, emotional distress, or physical

---

[94] The OPLA defines "product liability claim" as follows:

> "Product liability claim" means a claim or cause of action that is asserted in a civil action pursuant to sections 2307.71 to 2307.80 of the Revised Code and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:

> (a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;

> (b) Any warning or instruction, or lack of warning or instruction, associated with that product;

> (c) Any failure of that product to conform to any relevant representation or warranty.

> "Product liability claim" also includes any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product unreasonably interferes with a right common to the general public.

ORC § 2307.71(A)(13).

[95] *In re Nat'l Prescription Opiate Litig.*, 2018 WL 6628898, at *12-15 (N.D. Ohio Dec. 19, 2018).

[96] The OPLA defines "harm" to mean: "death, physical injury to person, serious emotional distress, or physical damage to property other than the product in question." ORC § 2307.71(A)(7).  By contrast, "economic loss" means: "direct, incidental, or consequential pecuniary loss, including, but not limited to, damage to the product in question, and nonphysical damage to property other than the product." ORC § 2307.71(A)(2).  Under the OPLA, the terms "harm" and "economic loss" are mutually exclusive.  *Id.* ("Economic loss is not 'harm.'"); ORC § 2307.71(A)(7) ("Harm is not 'economic loss.'").

30

damage to property other than the product in question;" and (3) arise from: (a) the design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of the product; (b) a failure to warn associated with the product; or (c) nonconformance of the product to a representation or warranty. ORC §§ 2307.71(A)(13), 2307.71(A)(7).

Most obviously, Plaintiffs' public nuisance claims do not satisfy the second requirement of a "product liability claim" because Plaintiffs do not seek compensatory damages for harm. Instead, Plaintiffs seek the equitable remedy of abatement, which is "intended to compensate the plaintiff for the costs to rectify the nuisance, going forward."[97] CT1 Daubert Order re: Abatement at 2 (Doc. #: 2519).[98] In other words, Plaintiffs seek prospective relief for economic loss that is pecuniary in nature. ORC § 2307.71(A)(2); CT1 Abatement MSJ Order at 5 (Doc. #: 2572).[99] Under Ohio law, where a plaintiff is not seeking compensatory damages for harm, courts have found the cause of action is not abrogated by the OPLA.[100] This same analysis applies to Plaintiffs' common-law claims seeking abatement for a public nuisance. *State v. Purdue Pharma L.P.*, No. 17 CI 261, 2018 WL 4080052, at *4 (Ohio Com. Pl. Aug. 22, 2018) (holding that, where the State did not seek damages for "death, physical injury to person, emotional distress or physical damage

---

[97] Although they certainly know better, Defendants incorrectly assert Plaintiffs seek payment for "backward-looking damages." Joint Motion at 25 (Doc. #: 4202). The Court has repeatedly rejected Defendants' attempts to mischaracterize Plaintiffs' requested relief in this manner. *See, e.g.,* CT1-A Daubert Order re: Abatement at 2 (Doc. #: 2519) (Defendants "appear to confuse the forward-looking, equitable remedy of abatement and the rearward-looking remedy of damages"); CT1 Abatement MSJ Order at 5 (Doc. #: 2572) (Defendants' argument that Plaintiffs' claim for "abatement costs" is, in fact, a claim for "damages," is not well-taken). Moreover, Defendants' assertion overlooks the fact that Plaintiffs do not seek compensation for *harm*, *i.e.* "death, physical injury to person, emotional distress, or physical damage to property." ORC §§ 2307.71(A)(13), 2307.71(A)(7).

[98] *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4043938, at *1 (N.D. Ohio Aug. 26, 2019).

[99] *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4194272, at *3 (N.D. Ohio Sept. 4, 2019).

[100] *See, e.g.*, *Darwish v. Ethicon, Inc.*, No. 20 CV 1606, 2020 WL 7129582, at *3 (N.D. Ohio Dec. 4, 2020) ("if a plaintiff brings a common law product liability claim seeking only economic loss damages, the claim is generally not within the purview of the OPLA"); *Great N. Ins. Co. v. BMW of N. Am. LLC*, 84 F. Supp. 3d 630, 648 (S.D. Ohio 2015) (where a plaintiff does not bring any claims under the OPLA for compensatory damages, the OPLA does not abrogate common law product liability claims seeking purely economic damages).

to property," the OPLA did not abrogate its common law nuisance claim seeking abatement based on alleged misrepresentations regarding the effectiveness and safety of prescription opioids); *see also Hardwick v. 3M Co.*, No. 2:18-cv-1185, 2019 WL 4757134, at \*13 (S.D. Ohio Sept. 30, 2019) (holding the OPLA did not abrogate plaintiff's common law negligence and battery claims seeking only injunctive, equitable, and declaratory relief).

Further, Plaintiffs' public nuisance claims do not satisfy either the first or third requirements of a "product liability claim." Plaintiffs' claims do not arise from a defective aspect of prescription opioids.[101] Rather, Plaintiffs' claims arise from an alleged oversupply of otherwise safe and non-defective drugs that were diverted into the black market, resulting in widespread opioid misuse and addiction. Stated differently, Plaintiffs' claims do not stem from the products themselves, but from the manner in which Defendants dispensed the products – that is, Defendants' failure to provide effective controls to detect "red flags" and prevent diversion. These allegations do not state claims for relief under the OPLA. *See* ORC §§ 2307.71 – 2307.80; *see also* Monroe County MTD Order at 16-17 (Doc. #: 3285)[102] (anti-diversion claims were not derived from the mere "selling" of opioids and did not depend on a "defective" product under Michigan product liability law); CT1 MTD Order at 31-32 (Doc. #: 1203) (Plaintiffs "are not asserting that the opioids themselves are defective, rather that Defendants negligently permitted (or even encouraged) diversion of those products") (finding the OPLA did not abrogate the *Track One* negligence claims); Muscogee R&R at 56 (Doc. #: 1499)[103] ("while Plaintiff's nuisance theory

---

[101] Under the OPLA, to establish liability against a manufacturer, a plaintiff must show, *inter alia*, that a defective aspect of the product was "the proximate cause of harm for which the claimant seeks to recover." ORC § 2307.73(A). Products may be "defective" due to their manufacture, design, inadequate warning, or nonconformance with a manufacturer's representations. ORC §§ 2307.71(A)(13), 2307.74, 2307.75, 2307.76, 2307.77.

[102] *In re Nat'l Prescription Opiate Litig.,* 458 F. Supp.3d 665, 680-81 (N.D. Ohio 2020).

[103] *In re Nat'l Prescription Opiate Litig.,* 2019 WL 2468267, at \*29 (N.D. Ohio Apr. 1, 2019).

concerns a product, it does not sound in products liability"), *adopted in relevant part by* Muscogee/Blackfeet MTD Order (Doc. #: 1680).[104]

Defendants' argument rests entirely on a 2007 Amendment adding language to the definition of "product liability claim," stating the term "also includes any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product unreasonably interferes with a right common to the general public."  CT1 MTD Order at 24 (Doc. #: 1203) (quoting ORC § 2307.71(A)(13)).  As the Court observed in *Track One*, the language "also includes" connotes "an illustrative example," as opposed to an "all-embracing definition," and is properly read to clarify the preceding definition of "product liability claim."  *Id.* at 26-27 (citations omitted).  Defendants urge the Court to interpret the 2007 Amendment in a way that abrogates *all* public nuisance claims involving products, regardless whether the claim otherwise meets the definitional requirements of "product liability claim," and regardless whether the OPLA provides relief for the alleged conduct.  In other words, Defendants advocate for a result that would nullify Plaintiffs' right to recover at common law while, at the same time, leaving Plaintiffs without a cognizable remedy under the OPLA.  Such a construction would directly contradict the Ohio Legislature's expressed intent that the 2007 Amendment was not meant to effectuate a substantive change in the law.  *See id.* at 24-25 (citations omitted).  For these reasons and those more fully set forth in the *Track One* ruling, the Court reaffirms that Plaintiffs' public nuisance claims are not abrogated by the OPLA.  *See id.* at 23-28.

---

[104] *In re Nat'l Prescription Opiate Litig.,* 2019 WL 3737023 (N.D. Ohio June 13, 2019).

## 2.    ORC § 4729.35

Defendants contend Plaintiffs' common law public nuisance claims are precluded because § 4729.35 provides the exclusive avenue of relief for public nuisance claims based on dispensing controlled substances.  Joint Motion at 25 (Doc. #: 4202).  Specifically, Defendants assert the Ohio legislature has "comprehensively regulated" the field of controlled substance dispensing and provided specific remedies that "conflict" with Plaintiffs' common law causes of action.  *Id.*  The Court previously rejected these same arguments in denying Defendants' *Track Three* motion to dismiss.  *See* CT3 MTD Order at 3-13 (Doc. #: 3403); *see also* CT3 MTD Reconsideration Order at 3 (Doc. #: 3499).[105]

Contrary to Defendants' contentions, the Ohio legislature has not "codified" the law or provided a comprehensive statutory or regulatory scheme precluding Plaintiffs' ability to seek public nuisance remedies at common law.  Section 4729.35 authorizes the state attorney general, county prosecutors, and the state board of pharmacy to bring a civil action "in the name of the state" to enjoin certain conduct, including a pharmacist's violation of federal or state laws governing the distribution of controlled substances, which it declares to be a "public nuisance" *per se*.  ORC § 4729.35; *see* CT3 MTD Order at 8-12 (Doc. #: 3403).  That the Ohio legislature has provided a statutory enforcement mechanism for authorized entities to enjoin violations of controlled substance laws does not, in itself, indicate an intent to preclude the same or different entities from seeking remedies otherwise available at common law based on the same conduct.  Defendants point to nothing in the statute or legislative history suggesting such an intent.[106]

---

[105] *In re Nat'l Prescription Opiate Litig.,* 2020 WL 5642173, at *1 (N.D. Ohio Sept. 22, 2020).

[106] The cases Defendants cite are distinguishable.  *See* Doc. #: 4202 at 25 (citing *Thompson v. Ford,* 128 N.E.2d 111, 115-16 (Ohio 1955) and *Bolles v. Toledo Trust Co.*, 58 N.E.2d 381, 392 (Ohio 1944)).  In *Thompson*, allowing the

34

In sum, Defendants do not explain – and the Court cannot conceive – how allowing Plaintiffs' public nuisance claims to proceed under common law would in any way conflict or interfere with an authorized entity's ability to enjoin the same alleged unlawful conduct under § 4729.35. The Court again concludes § 4729.35 does not preclude Plaintiffs' common law public nuisance claims.

### B.      Ohio Common Law

### 1.      Expansion of Nuisance Liability

The Pharmacies challenge the viability of Plaintiffs' public nuisance claim on public policy grounds, asserting that "extending public nuisance to the opioid crisis would allow consumers to convert almost every products liability action into a public nuisance claim." Joint Motion at 26-27 (Doc. #: 4202) (internal quotation marks and citation omitted). Defendants' argument relies exclusively on decisions from other states. *See id.* at 26-27 & n.2. For example, Defendants cite *Hunter v. Johnson & Johnson,* 499 P.3d 719 (Okla. 2021), which concluded the State could not assert public nuisance claims against opioid manufacturers under Oklahoma law based on the manufacturing, marketing, and selling of a lawful product. *Id.* at 723-731. In reaching this conclusion, the Oklahoma Supreme Court was guided by the fact that, for 100 years, it had limited liability under Oklahoma's public nuisance statute to defendants: "(1) committing crimes constituting a nuisance, or (2) causing physical injury to property or participating in an offensive

---

plaintiff to proceed at common law would have thwarted the express provisions of the statute at hand. *See Thompson*, 128 N.E. 2d at 116 (finding the specific and detailed statutory standard of care for parking a car at night supplanted the "ordinarily prudent person" standard of care under common law). In *Bolles*, the Court declined to apply a common law theory regarding the interpretation of wills where the General Assembly had "codified" the law on the subject. *Bolles*, 58 N.E.2d at 392. The Court disagrees that Chapter 4729 constitutes a "codification" of the claims or remedies available at common law. *See* CT3 Defendants' MTD at 9-12 (Doc. #: 3340-1).

activity that rendered the property uninhabitable." *Id.* at 724.  The *Hunter* court concluded that permitting public nuisance claims to address "policy problems" would leave Oklahoma's nuisance statute "impermissibly vague." *Id.* at 731; *see also* Joint Motion at 26-27 & n.2 (Doc. #: 4202).

But Defendants do not explain why *Hunter* (or any other case Defendants cite) should supplant Ohio law and apply to the claims in this case.  The Ohio Supreme Court has recognized that *Ohio's* law of public nuisance is broad enough to embrace, for example, claims that gun manufacturers "created a nuisance through their ongoing conduct of marketing, distributing, and selling firearms in a manner that facilitated their flow into the illegal secondary market." *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143 (Ohio 2002).  Unlike the *Hunter* court's approach, the *Beretta* court specifically emphasized the adaptability of Ohio law to new circumstances, noting: "although we have often applied public nuisance law to actions connected to real property or to statutory or regulatory violations involving public health or safety, we have never held that public nuisance law is strictly limited to these types of actions."  *Id.* at 1142 (internal citations omitted).  Put simply, Oklahoma law is different and inapplicable.

Plaintiffs bring their public nuisance claim under Ohio law and Defendants do not persuade the Court to adjudicate the claim under contrary law of other jurisdictions.

### 2.    Violation of a Public Right

Defendants contend Plaintiffs' nuisance claim fails to demonstrate interference with a public right.  They argue the claim is based only on an aggregation of private rights that derive from individual injuries and a risk of harm created by persons who misused prescription opioids. Joint Motion at 27-28 (Doc. #: 4202); Joint Reply at 16-17 & n.4 (Doc. #: 4256).  Numerous prior rulings of the Court found that position unpersuasive and recognized a commonly held public right

to be free from negative consequences of the opioid crisis that interfere with public health and safety.  *See* CT3 MTD Order at 26 & n.29 (Doc. #: 3403); Bakers MTD Order at 45 (Doc. #: 3177); CT1 Public Nuisance MSJ Order at 3-4 (Doc. #: 2578).[107]

Defendants' reliance on the recent Oklahoma Supreme Court decision, *Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021), is unavailing.  *Hunter* concluded that the "damages the State seeks are not for a communal injury but are instead more in line with a private tort action for individual injuries sustained from use of a lawful product and in providing medical treatment or preventive treatment to certain, though numerous, individuals." *Id.* at 727.  The *Hunter* decision, however, examined the "legal interpretation of *Oklahoma's* nuisance statutes," *id.* at 723 (emphasis added), which differ from Ohio's statutory and common law public nuisance law. Notably, Defendants undertake no comparison of the two states' public nuisance laws.  Nor do they identify any reason to alter the Court's prior 'public right' rulings.

### 3.    Regulated Conduct

Defendants contend that, as entities authorized to dispense controlled substances, they are extensively regulated by federal and state law and cannot be held liable for undertaking those activities; therefore, Plaintiffs' nuisance claims are not actionable.  Joint Motion at 28-29 (Doc. #: 4202).  In response, Plaintiffs point to the Court's previous rejections of that argument and its conclusion that Plaintiffs sufficiently stated common law absolute nuisance claims based on intentional and unlawful conduct resulting in harm.  Response at 104 (Doc. #: 4241).

---

[107] *In re Nat'l Prescription Opiate Litig.*, 406 F. Supp.3d 672, 674 (N.D. Ohio 2019).

Applying well-settled Ohio law, the Court has repeatedly analyzed and rejected Defendants' position, finding that "'safe harbor' immunity from absolute nuisance liability is available only to those who perform in accordance with their applicable licensing regulatory obligations, which Plaintiffs alleged Defendants did not do." Bakers MTD Order at 45-47 (Doc. #: 3177); *see also* CT3 GE MSJ Order at 4-5 (Doc. #: 3913); CT3 MTD Order at 29-30 (Doc. #: 3403).  Most recently, the Court addressed the argument that, having passed DEA and Ohio Board of Pharmacy inspections on numerous occasions, it would be unfair to Defendants to allow "a jury to overrule the favorable on-the-ground determinations made by these agencies and impose a post hoc finding" of liability.  CT3 GE MSJ Order at 2 (Doc. #: 3913).  The Court reiterated what it had "repeatedly instructed:  safe harbor immunity is available ***only*** to those who perform in accordance with their regulatory obligations," *id.* at 4-5 (emphasis in original), concluding that evidence submitted by Plaintiffs "tend[ed] to show material non-compliance with the CSA and related state obligations" raising triable issues of material fact, *id.* at 6-7.

Defendants have not persuaded the Court to rule that their conduct, albeit authorized and subject to regulations, is sheltered from nuisance liability.

### 4.      Control Over the Instrumentality Causing the Nuisance

Asserting that Plaintiffs failed to allege or prove the "traditional control element" of their public nuisance claims, Defendants posit the instrumentality creating or contributing to the alleged nuisance is the opioid medication.  Defendants further contend that, once opioids are dispensed, Defendants lack control of the physical opioid pills and, therefore, are unable to prevent the alleged nuisance.  Joint Motion at 29-30 (Doc. #: 4202).  As discussed above, Plaintiffs' claims "do not stem from the products themselves, but from the manner in which Defendants *dispensed* the

products, *i.e.* Defendants' failure to provide effective controls to detect 'red flags' and prevent

diversion."  *See* Point II.A.1, *supra*; *see also* Muscogee R&R at 57-58 (Doc. #: 1499)

("Defendant's arguments rest upon a false premise that the instrumentality of the nuisance is the

opioid medication. [The] alleged instrumentality of the nuisance is their creation and fueling of the

illicit market."), *adopted by* Muscogee/Blackfeet MTD Order (Doc. #: 1680) at 19-20; *see also*

CT1 Public Nuisance MSJ Order at 4-5 (Doc. #: 2578).  The Court's prior rulings stand.


### 5.    Predicate "Safety Statutes"

Reiterating a position raised in their *Track One-B* proposed jury instructions, Defendants

contend Plaintiffs are unable to prove liability based on unlawful conduct because they cannot

establish the violation of a "safety statute" that sets forth a specific, protective legal requirement

and provides a private right of action.  Joint Motion at 30-31 (Doc. #: 4202) (citing 1 Ohio Jury

Instructions CV 621.01).

Defendants endeavor to validate this conclusion by piecing together portions of numerous

cases (*id.*),[108] but this effort is strained, unpersuasive, and the Court previously rejected it.

Furthermore, the contention that Plaintiffs' claims fail because the CSA does not confer a private

right of action is inconsequential.  Plaintiffs do not undertake enforcement of the federal and Ohio

controlled substance laws or regulations.  Rather, their common law public nuisance claims allege

that Defendants engaged in conduct that was "proscribed by statute, ordinance or administrative

regulation" and unreasonably interfered with public rights. Response at 105-106 (Doc. #: 4241)

---

[108] Defendants cite *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 201 (Ohio 1998); *Uland v. S.E. Johnson Cos.*, 1998 WL 123086, at *5 (Ohio Ct. App. Mar. 13, 1998); *Smrtka v. Boote*, 88 N.E.3d 465, 474 (Ohio Ct. App. 2017); *Smith v. Hickenlooper*, 164 F. Supp. 3d 1286, 1290–91 (D. Colo. 2016); *Becker v. Shaull*, 584 N.E.2d 684, 685–87 (Ohio 1992).

(citing Restatement (Second) of Torts § 821B(2)(b)).

Previously, the Court undertook a comprehensive analysis of pharmacy duties under the

C.S.A. and concluded:

> Plaintiffs have sufficiently alleged the Pharmacy Defendants engaged in unlawful
> dispending conduct by failing to comply with statutory and regulatory requirements
> to provide effective controls against diversion, including ensuring proper
> dispensing of controlled substances.

CT3 MTD Order at 13-25, 29 & n.31 (Doc. #: 3403) ("the CSA statutory and regulatory framework

imposes specific obligations on pharmacies to protect against the diversion of controlled

substances").  The Court's conclusion is unchanged.  For these reasons, Defendants' contention

that Plaintiffs' unlawful conduct claim fails for lack of an alleged violation of a "safety statute" is

without merit.

### C.      Dispensing Conduct

#### 1.       Corporate-Level Dispensing Duties

From the inception of this litigation, Defendants have advanced the proposition that, while

the CSA imposes a "corresponding responsibility" upon pharmacists to make sure the prescriptions

they dispense are for a legitimate medical purpose, the CSA imposes no corporate-level

responsibility upon a Pharmacy that may employ thousands of pharmacists across the country.

Defendants have renewed this argument in their Rule 50(b) motion.  Joint Motion at 32-34 (Doc.

#: 4202).

The Court has repeatedly concluded this argument defies logic and common sense.  *See*

CT3 MTD Order at 13-21 (Doc. #: 3403); CT3 MTD Reconsideration Order at 4-7 (Doc. #:

3499). At a minimum, a corporation that employs pharmacists has the legal duty to: (1) establish

corporate procedures and policies that recognize the "corresponding responsibility" of its pharmacists and require its pharmacists to adhere to it; (2) supply its pharmacists with the tools necessary to enable them to perform their "corresponding responsibility;" and (3) develop and utilize a system for monitoring the compliance of its pharmacists with their legal duties.

But the proposition that the corresponding responsibility attaches to the *pharmacy*, and not just *pharmacists,* did not originate with this Court.  The DEA has expressly and consistently ruled that "[t]he corresponding responsibility to ensure the dispensing of valid prescriptions extends to the pharmacy itself."  *Top RX Pharmacy, Decision and Order*, 78 FR 26069-01, at 26082 (DEA May 3, 2013) (revoking a pharmacy's certificate of registration to dispense controlled substances based, in part, on the pharmacy's dispensing of unresolved "red flag" prescriptions) (citing various DEA decisions); *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195, Decision and Order*, 77 FR 62316-01, at 62341 (DEA Oct. 12, 2012) (same).  In these cases, the DEA has specifically found the corresponding responsibility under § 1306.04 prohibits ***a pharmacy*** from filling a prescription where it "knows or has reason to know" that the prescription is invalid.  *Top RX Pharmacy*, 78 FR 26069-01, at 26082 (a pharmacy may not dispense a prescription in the face of a red flag unless it first takes steps "to resolve the red flag and ensure that the prescription is valid") (citing various DEA decisions); *Holiday CVS*, 77 FR 62316-01, at 62341 (same).  And at least one other federal district court has agreed with this reasoning.  *See United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F.Supp.3d 1184, 1189-90 (E.D. Ky. 2017) (declining to dismiss the government's civil enforcement proceeding against a corporate pharmacy defendant, finding the CSA's corresponding duty extends to corporate pharmacies).

Moreover, the evidence introduced at trial by both Plaintiffs and Defendants not only refuted Defendants' argument that the CSA imposes no corporate level responsibility, but clearly

established that all three Defendant Pharmacies *knew* the CSA imposed corporate responsibility, and knew that the DEA, which has the responsibility to enforce the CSA, consistently took this position.

Plaintiffs' expert witness, Carmen Catizone, testified that his understanding, as a former Executive Director of the National Association of Boards of Pharmacy, is that "the CSA does not place unilateral responsibility on the pharmacist.  Responsibility also rests with the pharmacy."[109]  And Defendants' own expert, Demetra Ashley, former DEA Senior Administrator in the Department of Diversion Control, confirmed her understanding, based upon her years of experience, "that *a pharmacy and its pharmacists* have a corresponding responsibility . . . to fill only opioid prescriptions that are issued for a legitimate medical purpose[.]"[110]

Additional evidence clearly supporting this proposition is that each Defendant entered into settlement agreements with the DEA acknowledging the DEA's position that *pharmacies* have a corresponding responsibility.  Indeed, in CVS's 2013 settlement agreement, arising out of the *Holiday* case, CVS expressly acknowledged it had a corresponding dispensing responsibility at the corporate level.[111]  Similarly, Walgreens and Walmart each entered into settlements with the DEA agreeing to "maintain a compliance program designed to detect and prevent diversion of controlled substances as required by the [CSA] and applicable DEA regulations."  In these agreements,

---

[109] 10/7/21 Trial Tr. at 980:10-13 (Doc. #: 4005) (Catizone).

[110] 11/8/21 Trial Tr. at 6628-3-9 (Doc. #: 4132) (Ashley).

[111] CVS's 2013 settlement agreement with the DEA stated that:

> CVS acknowledges that it has a corresponding responsibility to dispense only those prescriptions that have been issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice and that knowingly filling a prescription not in the usual course of professional treatment or in legitimate and authorized research subjects CVS to penalties under the CSA.

Pls. Ex. P-8954 at 2 (Doc. #: 3999-7).

Walgreens and Walmart expressly agreed these compliance programs would include procedures to identify red flags for diversion across the entire corporation.[112]

At trial, Defendants' own compliance officers also confirmed their understanding that Defendants had a responsibility to ensure proper dispensing at the pharmacy corporate level. Following their settlements with the DEA, each Defendant implemented new policies and procedures to guard against diversion. For instance, CVS Senior Director of Pharmacy Nicole Harrington testified that, in direct response to the *Holiday* settlement, CVS developed new company-wide programs to monitor dispensing data and look for suspicious prescribing and dispensing patterns across all of its pharmacies nationally.[113] Similarly, Walgreens Divisional Vice President of Pharmacy Compliance Patient Safety, Natasha Polster, testified that, following Walgreens' 2011 settlement with the DEA, Walgreens rolled out its national Good Faith Dispensing policy to aid all of its pharmacists across the country in complying with the corresponding responsibility.[114] Likewise, Walmart Senior Director for Patient Safety Susanne Hiland testified that, as a result of Walmart's memorandum of agreement with the DEA, Walmart wrote specific new corporate policies applicable to all of its pharmacies nationwide, including updates identifying, for the first time, red flags for diversion.[115]

The testimony of these witnesses, combined with the evidence discussed above, demonstrated that Defendants clearly understood the DEA's long-held position that the CSA imposes a corresponding responsibility upon the *pharmacy* at the corporate level to ensure proper

---

[112] *See* Pls. Ex. P-15317 at 2 (Doc. #: 4094-11) (Walgreens' 2011 Administrative Memorandum of Agreement with DEA); Pls. Ex. P-14711 at 2 (Doc. #: 4029-19) Walmart's 2011 Administrative Memorandum of Agreement with DEA).

[113] 11/03/21 Trial Tr. at 5663:3-18, 5688:4-5692:21 (Doc. #: 4015) (Harrington).

[114] 10/29/21 Trial Tr. at 2907:2-8 (Doc. #: 4050) (Polster).

[115] 11/01/21 Trial Tr. at 5200:7:19, 5226:13:24, 5236:25-5237:6 (Doc. #: 4109) (Hiland).

dispensing.[116]  Consistent with the DEA's position and Defendants' understanding thereof, the Court reaffirms its prior holdings that the CSA imposes a "fundamental mandate" on pharmacies to affirmatively implement effective measures to prevent diversion, which includes a corresponding duty to not knowingly fill or allow to be filled an illegitimate prescription.  CT3 MTD Order at 21 (Doc. #: 3403); CT3 MTD Reconsideration Order at 5-7 (Doc. #: 3499).

### 2.    Penalizing Lawful Dispensing Conduct

Defendants assert Plaintiffs seek to penalize lawful conduct in violation of preemption and due process principles, arguing they cannot be held liable for dispensing activities that the DEA has "authorized."  Joint Motion at 34-36 (Doc. #: 4202).  This argument is based on a flawed premise that fundamentally misconstrues the nature of Plaintiffs' claims.  Plaintiffs do not assert nuisance liability based on lawful conduct by Defendants.  Plaintiffs' claims are premised on Defendants' alleged unlawful conduct in violating their obligations to provide effective controls to detect "red flags" and prevent diversion, and/or intentionally contributing to an oversupply of highly addictive drugs in Plaintiffs' communities.  *See, e.g.,* Response at 108-109 n.97 (Doc. #: 4241) (plaintiffs do not seek to hold Defendants liable for simply dispensing large volumes of opioids, but for dispensing large volumes of opioids in the face of unresolved "red flags"); CT3 GE MSJ Order at 5 (Doc. #: 3913) ("if the defendant did not comply with the regulatory scheme, the

---

[116] At trial, Joseph Rannazzisi, former Deputy Assistant Administrator of the DEA's Office of Diversion Control, explained the DEA's view of the roles of the pharmacy and pharmacist in carrying out the corresponding responsibility.  Rannazzisi stated that, as the DEA registrant, the pharmacy is the responsible party, so "the pharmacist conducts the business of the pharmacy that's registered." 10/12/21 Trial Tr. at 1576:18-1578:13 (Doc. #: 4017). Rannazzisi continued: "[t]he pharmacist is under that obligation of corresponding responsibility, but he wouldn't be a pharmacist . . . he wouldn't be practicing pharmacy without that pharmacy license.  The pharmacist inevitably is responsible to practice pharmacy, but the pharmacy, the registrant, is ultimately responsible for what that pharmacist does." *Id.* at 1579:8-14.

conduct *is* actionable as a public nuisance").  Defendants' arguments do not apply to public nuisance claims based on *unlawful* conduct and, thus, do not address Plaintiffs' claims.

### 3.      No Private Right of Action

Defendants argue the DEA has exclusive authority to enforce the CSA, and Plaintiffs have no legal right to enforce Defendants' alleged "failure to maintain effective controls" at common law.  Joint Motion at 34-36 (Doc. #: 4202).  However, Plaintiffs do not seek to enforce Defendants' statutory and regulatory duties.  Response at 109 (Doc. #: 4241).  Instead, Plaintiffs assert claims based on common law duties that look to statutory requirements to measure the applicable standard of care.  *See* Plaintiffs' Opp. re: Summit County MTD at 74-78 (Doc. #: 654).  As the Court has previously concluded, Plaintiffs' nuisance claims do not rest on a private right of action under the CSA.  Muscogee R&R at 43 (Doc. #: 1499), *adopted in relevant part by* Muscogee/Blackfeet MTD Order (Doc. #: 1680); Summit County R&R at 74-78 (Doc. #: 1025),[125] *adopted in relevant part by* CT1 MTD Order at 24 (Doc. #: 1203).

### 4.      Primary Jurisdiction Doctrine

Citing the primary jurisdiction doctrine, Defendants urge the Court to refrain from adjudicating Plaintiffs' public nuisance claims, asserting the claims require resolution of issues that fall within the "special competence" of the DEA.  Joint Motion at 37 (Doc. #: 4202) (citation omitted).  Defendants contend the Court should leave for the DEA's determination "whether Defendants have complied with the CSA."  *Id.* at 37.  More specifically, Defendants state: "the

---

[125] *In re Nat'l Prescription Opiate Litig.*, 2018 WL 4895856, at *36-37 (N.D. Ohio Oct. 5, 2018).

Court should stay its hand until [the] DEA has had an opportunity to pass upon Plaintiffs' novel theory of the duties that the CSA imposes on Defendants."  Joint Reply at 17 (Doc. #: 4256).  Plaintiffs respond the claims in this case do not warrant an agency referral and, in any event, Defendants' request comes much too late to enhance the efficiency of these proceedings.  Response at 109-111 (Doc. #: 4241).  The Court agrees with Plaintiffs.

The primary jurisdiction doctrine allows courts, in their discretion, to refer matters for an agency determination "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."  *Charvat v. Echostar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir. 2010) (quoting *U.S. v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64 (1956)).  The doctrine is "concerned with promoting the proper relationships between the courts and administrative agencies charged with particular regulatory duties."  *W. Pac. R.R. Co.*, 352 U.S. at 63.  There is no "fixed formula" for its application.  *Id.* at 64.  A variety of reasons may support an agency referral, including: (1) "to advance regulatory uniformity;" (2) "to answer a question within the agency's discretion;" and (3) "to benefit from technical or policy considerations within the agency's expertise."  *Charvat*, 630 F.3d at 466 (quotations and citations omitted).  "In every case, the question is whether the reasons for the existence of the [primary jurisdiction] doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation."  *W. Pac. R.R. Co.*, 352 U.S. at 64.

Defendants focus on the third category of reasons for referral, arguing the "novel" question of a pharmacy's corporate-level CSA dispensing obligations requires the DEA's "expertise with a complicated statutory and regulatory framework."  Joint Reply at 18 (Doc. #: 4256).  The DEA, however, has already provided clear guidance on this issue.  Specifically, the DEA has determined that *all* registrants, including pharmacies, must "provide effective controls and procedures" to

46

guard against diversion of controlled substances.  21 C.F.R. § 1307.71(a).  Further, the DEA has

specifically identified that, under the CSA, a *pharmacy* has dispensing-based obligations to: (1)

prohibit the filling of a prescription where it "knows or has reason to know" that a prescription is

invalid; and (2) not dispense a prescription "in the face of a red flag (*i.e.* a circumstance that does

or should raise a reasonable suspicion as to the validity of a prescription) unless … it takes steps

to resolve the red flag and ensure that the prescription is valid."[126] *Top RX Pharmacy*; *Decision*

*and Order*, 78 FR 26069-01, 26082 (DEA May 3, 2013) (citing various DEA decisions); *see also*

CT3 MTD Order at 18-19 (Doc. #: 3403) (same).  Contrary to Defendants' assertions, the Court is

well-equipped and fully capable to apply these established legal standards to the claims in this

case.[127]

Moreover, Defendants have not shown that an agency referral would efficiently aid in the

resolution of Plaintiffs' claims.  *See, e.g., United States v. Philip Morris USA Inc.*, 686 F.3d 832,

838 (D.C. Cir. 2012) (the primary jurisdiction doctrine is rooted, in part, in judicial efficiency);

*In re JUUL Labs, Inc.*, 497 F. Supp.3d 552, 579-580 (N.D. Cal. 2020) ("under Ninth Circuit

---

[126] The DEA has articulated the following factors to establish a dispensing violation: "(1) the [pharmacy] dispensed a controlled substance; (2) a red flag was or should have been recognized at or before the time the controlled substance was dispensed; and (3) the question created by the red flag was not resolved conclusively prior to the dispensing of the controlled substance."  *Top RX Pharmacy*, 78 FR at 26082 (citation omitted).

[127] *See, e.g. City of Chicago v. Purdue Pharma L.P.*, 211 F.Supp.3d 1058, 1065 (N.D. Ill. 2015) (declining to invoke the primary jurisdiction doctrine, finding courts are "well-equipped" to adjudicate state law claims for fraud, conspiracy, and unjust enrichment involving defendants' alleged misrepresentations regarding the risks and benefits of opioids to treat long-term, chronic pain); *Rikos v. Procter & Gamble Co.*, 782 F.Supp.2d 522, 529-530 (S.D. Ohio 2011) (the primary jurisdiction doctrine "is to be used only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency").  For similar reasons, this case does not require referral based on the first or second reasons, *i.e.* the need for "regulatory uniformity" or agency discretion.  *Cf. Backus v. General Mills, Inc.*, 122 F.Supp.3d 909, 933-935 (N.D. Calif. 2015) (staying the case to allow the FDA to answer the complicated question of whether small amounts of trans fats can lawfully be used as a food additive, which was a matter of first impression, requiring agency expertise, that the FDA had already committed to review); *City of Dearborn v. Comcast of Michigan III, Inc.*, No. 08-10156, 2008 WL 4534167, at *10 (E.D. Mich. Oct. 3, 2008) (staying plaintiffs' claims to enforce FCC orders pending referral to the FCC of unresolved technical issues regarding distinctions between analog and digital formats that would affect national cable policy and therefore required uniformity).

precedent, efficiency is the deciding factor in whether to invoke primary jurisdiction") (quotations and citations omitted).  After years of protracted litigation, Defendants first raised the matter of primary jurisdiction at the close of Plaintiffs' evidence, in the middle of an eight-week jury trial on the Phase One issue of liability on Plaintiffs' absolute nuisance claims in the third bellwether trial.  *See* Joint Reply at 19 (Doc. #: 4256) (citing Joint 50(a) Motion at 35 (Doc. #: 4098)).

Defendants assert they timely raised the primary jurisdiction issue "once it became apparent at trial that Plaintiffs' theory of liability depended entirely on proving an underlying violation of the CSA based on an extra-statutory 'red flags' theory."  Joint Reply at 19 (Doc. #: 4256).  Although Defendants do not elaborate, they apparently refer to the fact that, during trial*,* Plaintiffs decided to abandon their distribution-based claims and proceed only on the dispensing-based claims.[128]

Defendants have known for years, however, that CSA dispensing duties were central to Plaintiffs' claims against the Pharmacies in these MDL proceedings.[129]  Further, the Pharmacies' dispensing-related duties have been the primary focus of the parties' discovery and pretrial motions in the *Track Three* cases.[130]  On these facts, the Court rejects Defendants' claim that they are somehow justified in delaying their primary jurisdiction argument.

---

[128] Defendants' argument ignores the fact that, in addition to unlawful conduct, Plaintiffs' absolute public nuisance claims also proceeded on *intentional* dispensing conduct.  Moreover, at the time Defendants raised their primary jurisdiction argument, it appears the distribution claims were still in the case.  *See* CT3 Defendants' 50(a) Motion at 2-7 (Doc. #: 4098) (arguing Plaintiffs did not present sufficient evidence to support the distribution-based claims) (filed October 29, 2021).  Plaintiffs' response, however, addressed only the dispensing-based claims.  *See* 50(a) Response at 2-66 (Doc. #: 4131) (filed November 8, 2021).

[129] *See, e.g.,* CT1-B Case Mgmt. Order at 2-4 (Doc. #: 2940) (allowing Plaintiffs to proceed in the *Track One-B* cases with dispensing-related claims against the Pharmacies, noting: "[d]ispensing-related claims are at issue in many of the nearly 2500 cases in this MDL") (filed November 19, 2019).

[130] *See, e.g.,* CT3 Case Mgmt. Order at 3 (Doc. #: 3325) (setting the schedule for fact discovery regarding dispensing data) (filed June 5, 2020); CT3 Defendants' MTD at 14-20 (Doc. #: 3340) (asserting the dispensing claims fail as a matter of law) (filed June 16, 2020); CT3 MTD Order at 3-33 (Doc. #: 3403) (rejecting Defendants' legal challenges to Plaintiffs' public nuisance claims based on dispensing activity) (filed August 6, 2020).

Based on the foregoing analysis, the Court declines to refrain from adjudicating Plaintiffs' public nuisance claims based on the primary jurisdiction doctrine.[131]

### D.      Additional Arguments

#### 1.      Standing

Defendants raise a new standing argument, drawing the Court's attention to the Supreme Court's recent decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021).  Defendants contend that, under *TransUnion*, Plaintiffs cannot base Article III standing "on regulatory noncompliance or an allegedly increased risk of harm stemming from regulatory noncompliance." Joint Motion at 38 (Doc. #: 4202).  *TransUnion*, however, does not mandate dismissal of Plaintiffs' claim.  There, the Supreme Court explained that a plaintiff who has not suffered "any physical, monetary, or cognizable intangible" concrete harm lacks standing to proceed with a suit based only on alleged violations of regulatory statutes.  The Court concluded,

> An *uninjured* plaintiff who sues in those circumstances is, by definition, not seeking to remedy any harm to herself but instead is merely seeking to ensure a defendant's "compliance with regulatory law" (and, of course, to obtain some money via the statutory damages). . . . Those are not grounds for Article III standing.

141 S. Ct. 2190, 2206, 2207 n.3 (citations omitted) (emphasis added); *see also Ward v. Nat'l Patient Acct. Servs. Sols., Inc.,* 9 F.4th 357, 363 (6th Cir. 2021) ("Because [Plaintiff] has failed to

---

[131] Although the Court need not reach this issue, it notes Defendants provide no suggestion as to how an agency referral might operate on the facts of the case, or whether the DEA has authority or the procedural means to determine the matters that Defendants seek to refer.  *See, e.g. Reiter v. Cooper,* 507 U.S. 268-69 (1993) (although courts in the context of primary jurisdiction loosely use the term "referral," most statutes contain no mechanism whereby a court can, on its own authority, request a determination from the agency; that is left to the adversary system, whereby the court merely stays its proceedings to give a party reasonable time to file for an administrative ruling); *see also Rikos v. Procter & Gamble Co.,* 782 F.Supp.2d 522, 529-530 (S.D. Ohio 2011) (courts have declined to apply the primary jurisdiction doctrine "where the case is based on state law or legal questions that would not be finally resolved by the agency").

show more than a bare procedural violation of the FDCPA, he does not have standing to bring his claims . . . .").  The *TransUnion* Court also found that, in a suit for damages, unmaterialized risk of future harm, without more, is insufficient to confer Article III standing. 141 S.Ct. 2190, 2211-2212; *see also Beaudry v. TeleCheck Servs., Inc.*, 854 F. App'x 44, 46 (6th Cir. 2021) (statutory damages "cannot redress a 'risk of future harm, standing alone.'") (quoting *TransUnion*, 141 S.Ct. at 2210-11).

Defendants do not persuade this Court that *TransUnion* applies to strip Plaintiffs of their standing to sue.  Plaintiffs' claim is not based only on statutory violations or hypothetical risks of future harm.  Nor does Defendants' reference to the standing challenges made in *Track One* present any new or different reason for the Court to amend its prior finding.  Plaintiffs satisfy the standing requirements by "plausibly plead[ing] an injury in fact that is fairly traceable to the actions of Defendants."  *See* Summit County R&R at 28-33, 100-102 (Doc. #: 1025), *adopted by* CT1 MTD Order at 2, 10 (Doc. #: 1203); *see also Krueger v. Experian Info. Sols., Inc.,* 2021 WL 4145565, *2 (6th Cir. Sept. 13, 2021) ("A plaintiff has standing if he suffered an injury in fact, fairly traceable to the defendant's alleged misconduct, which the relief he seeks would likely redress.") (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  In sum, Defendants' standing argument fails.

### 2.    Economic Loss Doctrine.

Defendants renew previous arguments challenging the Court's determinations that the economic loss doctrine does not apply to bar Plaintiffs' absolute public nuisance claims.  Joint Motion at 38-39 (Doc. #: 4202).  Ohio caselaw clearly and uniformly limits application of this doctrine to negligence-based qualified nuisance claims and finds it does not apply to intentional

torts, such as the intentional misconduct alleged by Plaintiffs.  *See* Bakers MTD Order at 55-59

(Doc. #: 3177).  Precedent cited by Defendants does not refute, but rather supports, the Court's

prior analysis and conclusion.  *See id.* at 58-59 & n.35.

Defendants also cite authority not raised in prior motions, but their reliance on the

Restatement (Third) of Torts: Liab. For Econ. Harm § 8 cmt. g is misplaced.  As Plaintiffs point

out, Section 8 applies only to claims for economic loss brought by a private party who suffered

an injury "distinct in kind from those suffered by members of the affected community in

general."  *See* Response at 113-114 (Doc. #: 4241) (quoting Section 8 cmt. a).  Furthermore,

Section 8 expressly recognizes the authority of governmental entities to maintain public nuisance

claims, instructing:

> In addition to the common-law claims recognized here, public officials may bring
> civil or criminal actions against a defendant who creates a public nuisance. . . . An
> action of that type is the most common response to a defendant's invasion of a
> public right. The definition of "public nuisance" for those purposes is widely a
> matter of statute, and tends to be considerably broader than the common-law
> definition recognized by this Section as a basis for a private suit.

Section 8 cmt. a.[132]

Defendants' prior and present arguments fail to demonstrate that the "economic loss"

doctrine bars Plaintiffs' public nuisance claim.


### 3.      Statewide Concern Doctrine

The parties incorporate by reference previous briefings regarding Ohio courts' application

---

[132] Section 8 is consistent with the Restatement of Torts (Second) § 821C (1) & (2), which provides, "to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference," and acknowledges the authority of a public official or public agency to maintain an action to abate a public nuisance.

of the "statewide concern" doctrine.  Joint Motion at 39-40 (Doc. #: 4202); Response at 114 (Doc. # 4241).  In the absence of any new arguments, the Court confirms its prior reasoning and conclusion: dismissal under the doctrine is unwarranted because Defendants fail to demonstrate "the doctrine applies to preclude lawsuits brought [by municipalities] to vindicate rights under federal or state law" and where Plaintiffs' lawsuit did not conflict with state law.  *See* CT1 MTD Order at 2 (Doc. #: 1203), *adopting without objection* Summit County R&R at 98-100 (Doc. #: 1025); *see also* Broward County MTD Order at 6-8 (Doc. #: 3274).[133]

### 4.    Municipal Cost Recovery Rule

Drawing on the analyses and conclusions of the Ohio Supreme Court and other courts across the country that declined to apply the Municipal Cost Recovery Rule (also known as the Free Public Services Doctrine),[134] the Court has repeatedly refused to find the Rule precludes recovery for public costs when "an ongoing and persistent course of intentional misconduct creates an unprecedented, man-made crisis that a governmental entity plaintiff could not have reasonably anticipated as part of its normal operating budget . . . ."  Muscogee/Blackfeet MTD Order (Doc. #: 1680) at 13-14, *adopting* Muscogee R&R at 15-17 (Doc. #: 1499) and Blackfeet R&R at 8 (Doc. #: 1500);[135] Summit County R&R at 17-22 & nn.14-17 (Doc. #: 1025), *adopted by* CT1 MTD Order at 19 (Doc. #: 1203); Monroe County MTD Order at 23-24 (Doc. #: 3285); Broward County

---

[133] *In re Nat'l Prescription Opiate Litig.*, 2020 WL 1986589, at *4 (N.D. Ohio April 27, 2020).

[134] *See Cincinnati v. Beretta U.S.A. Corp.,* 768 N.E.2d 1136 (Ohio 2002); *State ex rel. Jennings v. Purdue Pharma L.P.*, 2019 WL 446382, at *6 (Del. Super Ct. Feb. 4, 2019); *In re Opioid Litigation*, 2018 WL 3115102, at *22; (N.Y. Sup. Ct. June 18, 2018); *City of Everett v. Purdue Pharm L.P.*, 2017 WL 4236002, at *7 (W.D. Wash. Sept. 25, 2017); *James v. Arms Tech., Inc.*, 820 A.2d 27, 48-49 (N.J. App. Div. 2003); *City of Boston v. Purdue Pharma L.P.*, 2020 WL 2198026, at *4 (Mass. Super. Feb. 10, 2020); *Cherokee Nation v. McKesson Corp.*, 529 F. Supp. 3d 1225, 1234 (E.D. Okla. 2021).

[135] *In re Nat'l Prescription Opiate Litig.*, 2019 WL 2477416, at *5 (N.D. Ohio April 1, 2019).

MTD Order at 9-11 (Doc. #: 3274).  The Ohio Supreme Court, in *Cincinnati v. Beretta U.S.A. Corp.,* 768 N.E.2d 1136, 1149-1150 (Ohio 2002), found the Rule did not bar recovery of governmental costs resulting from defendants' ongoing and persistent misconduct.  *Beretta* provides authoritative precedent for this Court's conclusion that

> the costs of Plaintiff's governmental services are recoverable to the extent that they exceed the ordinary costs of providing those services and evidence establishes that they were incurred due to the Defendants' violation of state law.

Muscogee R&R at 17 (Doc. #: 1499), *adopted by* Muscogee/Blackfeet MTD Order at 13-14 (Doc. #: 1680); *see also* Blackfeet R&R at 8 (Doc. #: 1500); CT1 MTD Order at 19 (Doc. #: 1203); Summit County R&R at 17-22 (Doc. #: 1025).

Defendants cite no Ohio case law applying the Rule.  Rather, they rely on two cases from other states, *Walker County v. Tri-State Crematory*, 643 S.E.2d 324, 327 & n.3 (Ga. Ct. App. 2007), and *City of Chicago v. Beretta U.S.A.,* 821 N.E.2d 1099, 1145 (Ill. 2004), neither of which provides a basis for the Court to reverse its prior decisions concluding that the Rule does not apply.

### 5.  Statute of Limitations

The Pharmacies assert Plaintiffs' suits are based on alleged conduct that evidence demonstrates ceased more than four years ago, so the claims are time barred.  Joint Motion at 40-43 (Doc. #: 4202) (citing ORC §§ 2305.09 and 2305.10).  Relying on caselaw addressing qualified nuisance claims, which are subject to statutes of limitations, Defendants argue Plaintiffs' time to file is not extended by either the discovery-rule, fraudulent concealment, or continuing violations doctrines.  *Id.*  Nothing in the Pharmacies' statute of limitations argument gives the Court reason to alter its *Track One* conclusion that accrual dates and tolling doctrines are "irrelevant" because "absolute and statutory public nuisance claims are exempt from a statute of limitations."  CT1 MSJ

re: Statute of Limitations at 1-6, 12-25 (Doc. #: 2568).[136]

### 6.    Ongoing Nuisance

Defendants declare that Plaintiffs must, but do not, demonstrate an *ongoing* public nuisance.  They posit that Plaintiffs at most purport to demonstrate the existence of "a current illicit opioid crisis, but their own evidence shows that Defendants only ever dispensed FDA-approved prescription opioids."  Joint Motion at 43 (Doc. #: 4202) (citing excerpts of Plaintiffs' experts' trial testimony).[137]  The Court construes the argument to be: having ceased the alleged misconduct, Defendants are not responsible for subsequent consequences of the oversupply and diversion of legal prescription opioids into illegitimate markets.  The argument is not well taken.[138]

A nuisance may result either from harm caused by human activity *or* by a physical condition that results from the activity and continues after the conduct leading to the condition ceases. *See* Restatement § 821(A), cmt. b.[139]  Plaintiffs' assertion that the nuisance is "continuing" fits well within the Restatement: "if the activity has resulted in the creation of a physical condition that is of itself harmful after the activity that created it has ceased, a person who carried on the activity that created the condition or who participated to a substantial extent in the activity is

---

[136] *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4174296, at *1-3, 7-14 (N.D. Ohio September 4, 2019).

[137] Defendants' reliance on their statute of limitations argument, (Doc. #: 4202 at 40-43), does not advance their position.  As the Court previously found and reaffirmed, *supra,* caselaw pertaining to qualified nuisance claims brought by private parties seeking damages for negligent conduct does not apply to bar public nuisance claims brought by government entities. CT1 MSJ re: Statute of Limitations at 4 (Doc. #: 2568).

[138] Defendants' ongoing nuisance argument echoes their prior contention that FDA-approved medications only injure persons when they are mis-prescribed and/or misused.  The Court found this contention was essentially an attempt "to place blame on victims of the opioid addiction" and firmly rejected the proposition. *See* Muscogee/Blackfeet MTD Order (Doc.#: 1680) at 20.

[139] *See also* Restatement § 834, cmt. e ("[I]f the activity has resulted in the creation of a physical condition that is of itself harmful after the activity that created it has ceased, a person who carried on the activity that created the condition or who participated to a substantial extent in the activity is subject to the liability for a nuisance, for the continuing harm.").

subject to the liability for a nuisance, for the continuing harm."  Restatement § 834, cmt. e; *see also Dartron Corp. v. Uniroyal Chem. Co.*, 893 F. Supp. 730, 733, 741 (N.D. Ohio 1995) (denying summary judgment of claim alleging that environmental contamination nuisance continued 20 years after defendant's nuisance-causing activity ceased); *Crown Prop. Dev., Inc. v. Omega Oil Co.*, 681 N.E.2d 1343, 1352 (Ohio Ct. App. 1996) (affirming denial of summary judgment of nuisance claim where evidence demonstrated that actual contamination continued despite removal of contamination sources years earlier).  This authority confirms that, even if, as Defendants assert, they discontinued the conduct that led to the existence of the nuisance, they are still subject to liability for abatement of any ongoing consequential effects of the nuisance.

### 7.      Expert Testimony

Defendants insist the Court improperly admitted the testimony of five expert witnesses at trial: (1) Dr. Caleb Alexander; (2) Carmen Catizone; (3) Dr. Katherine Keyes; (4) Dr. Anna Lembke; and (5) Dr. Craig McCann.  Defendants contend that, absent the testimony of any one of these witnesses, the trial evidence would be insufficient to support a verdict for Plaintiffs as a matter of law.  Essentially, Defendants rehash the same or similar arguments the Court has already rejected in its prior *Daubert* rulings.  For the reasons previously stated and further discussed below, the Court reaffirms those rulings here.

### a.      Dr. Caleb Alexander

In its *Daubert* ruling, the Court found that, as a pharmacoepidemiologist, Dr. Caleb Alexander was qualified to opine on the existence of the opioid epidemic and the scope and impact of harms allegedly caused by Defendants' conduct with respect thereto.  CT3 Daubert Order re

Alexander at 3-5 (Doc. #: 3948).[140]  In so ruling, the Court noted Plaintiffs' agreement that Dr. Alexander's remedy-related opinions concerning abatement were irrelevant to issues in the Phase One trial.  *Id.* at 3-5.

In their post-trial motion, Defendants assert Dr. Alexander's trial testimony was "primarily" about abatement and, therefore, irrelevant to the Phase One trial.  Joint Motion at 44 (Doc. #: 4202).  To support this assertion, Defendants cite to 5 pages - out of 142 total pages – of Dr. Alexander's trial testimony transcript.  *Id.* (citing 10/21/21 Trial Tr. at 3533-3537 (Doc. #: 4064)).  As an initial matter, the Court notes that, at trial, Defendants did not object to the testimony which they now challenge.  Rather, *defense counsel* elicited the subject testimony on cross examination by using specific and leading questions regarding Dr. Alexander's previous recommendations to a United States Senate Committee about measures that could be taken to address the opioid epidemic, including: (1) improving doctors' prescribing practices; (2) providing effective treatment to addicted individuals; and (3) disposing of excess medicines sitting in peoples' homes.  10/21/21 Trial Tr. at 3533-3535 (Doc. #: 4064).

Contrary to Defendants' assertions, Dr. Alexander's trial testimony overwhelmingly addressed his opinions regarding the existence of an opioid epidemic and the multiple causation factors thereof.  *Id.* at 3458-3572.  Dr. Alexander's testimony was therefore directly relevant to the issues at stake, and properly admitted as evidence, in the Phase One trial.

### b.  Carmen Catizone

Defendants argue Carmen Catizone offered unreliable opinions at trial, because Catizone

---

[140] *In re Nat'l Prescription Opiate Litig.*, 2021 WL 4146254, at *2 (N.D. Ohio Sept. 13, 2021).

56

applied his "red flag" methodology "mechanistically" and did not determine whether it actually identified prescriptions that were likely to be illegitimate or diverted.  Joint Motion at 44 (Doc. #: 4202).  The Court rejected these same arguments in its *Daubert* ruling, finding Catizone's extensive experience in the practice and regulation of pharmacy provided a reliable basis for him to testify regarding different "red flag" metrics that were available to pharmacists to identify and resolve potentially illegitimate prescriptions.  CT3 Daubert Order re Catizone at 5-7 (Doc. #: 3947).[141]  The Court reaffirms its previous ruling and confirms that it was indeed helpful for the jury to hear evidence about the number of potentially suspicious prescriptions that Catizone's metrics would have flagged.  *See id.*  Defendants' post-trial arguments go to the weight of Catizone's testimony, not its admissibility.[142]  Catizone's opinions were properly admitted for the jury's consideration at trial.  *See id.* at 7-8, 11-12.

### c.      Dr. Katherine Keyes

Defendants assert Dr. Katherine Keyes improperly expressed causation opinions that "were not based on peer-reviewed literature, and have not been scientifically tested in any way."  Joint Motion at 44 (Doc. #: 4202).  Defendants made the same arguments in their *Daubert* motion, which the Court denied. *See* CT3 Daubert Order re Keyes at 9-12 (Doc. #: 3946)[143] (studies and published literature sufficiently support Dr. Keyes' causation methodology); CT3 Daubert Motion re Keyes

---

[141] *In re Nat'l Prescription Opiate Litig.*, 2021 WL 4146672, *3-5 (N.D. Ohio Sept. 13, 2021).

[142] *See, e.g., Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *United States v. Lang*, 717 F. App'x 523, 534 (6th Cir. 2017) ("The *Daubert* standard is liberal, and it does not require expert opinions to be bulletproof.") (citation omitted).

[143] *In re Nat'l Prescription Opiate Litig.*, 2021 WL 4146245, *5-7 (N.D. Ohio Sept. 13, 2021).

at 1 (Doc. #: 3858-2).[145]  Defendants now contend that, at trial, defense counsel elicited cross examination testimony from Dr. Keyes that "discounted" her causation findings by highlighting conflicting information found in various underlying studies cited in Dr. Keyes' report.  Joint Motion at 44 (Doc. #: 4202) (citing 10/26/21 Trial Tr. at 4120-4021, 4134-4135 (Doc. #: 4090)). Defendants' arguments clearly go to the weight of Dr. Keyes' testimony, not its admissibility.  *See Daubert*, 509 U.S. at 596; *Lang*, 717 F. App'x at 534.  The Court finds Dr. Keyes' causation opinions were both reliable and admissible at trial.  *See* CT3 Daubert Order re Keyes at 9-12 (Doc. #: 3946).

### d.    Dr. Anna Lembke

Defendants assert Dr. Anna Lembke improperly testified on topics regarding the Pharmacies' national policies and dispensing practices that extended "far beyond her expertise and qualifications."  Joint Motion at 45 (Doc. #: 4202).  Specifically, Defendants object to Dr. Lembke's trial testimony that: "(1) Defendants' policies and procedures were not effective or adequate to detect red flags; and (2) Defendants increased the supply of opioids and failed to provide effective controls against diversion, which led to opioid misuse and addiction."  *Id.* (citing 10/06/21 Trial Tr. at 636-637, 540-541 (Doc. #: 4000).[146]

---

[145] *See also* CT1 Daubert Order re Gateway Hypothesis at 8-13 (Doc. #:2518) (*In re Nat'l Prescription Opiate Litig.*, 2019 WL 4043943, at *4-6 (N.D. Ohio Aug. 26, 2019) (a reliable basis, including studies and publications, supported Dr. Keyes' causation opinions).

[146] It appears Defendants' citation to pages 540-541 is incorrect and perhaps should be to pages 640-641.  *Compare* Doc. #: 4000 at 540-541 (Lembke discussing every human being's potential to become addicted) *with id.* at 640:23-641:4 (Lembke confirming part of her sixth opinion: "by increasing and assuring the supply of opioids and failing to provide effective controls against diversion, pharmacies contributed to opioid misuse, addition, dependence, and death").

In pretrial proceedings, the Court held a *Daubert* hearing to determine the scope of Dr. Lembke's opinions, qualifications, and expertise. *See* 09/10/21 Hearing Tr. (Doc. #: 3944). Based on Dr. Lembke's pretrial testimony[147] and information provided in her Report, the Court found that, as a medical doctor, Dr. Lembke has engaged with the practical effects of pharmacy dispensing policies and practices, on a daily basis, amounting to "thousands" of professional interactions with pharmacies and pharmacists. CT3 Daubert Order re Lembke at 12 (Doc. #: 3953).[148] Further, the Court determined that, as an expert in opioid addiction, Lembke is qualified to opine generally on the downstream effects of actions the pharmacies took or did not take in carrying out their business. *Id.* at 12. The Court found Lembke has the requisite expertise to provide reliable opinions: (1) regarding circumstances surrounding prescriptions that should raise "red flags" to both doctors and pharmacists; and (2) that pharmacists' failure to examine prescriptions for "red flags" leads to misuse and diversion. *Id.* at 13. The Court concluded Lembke is qualified to opine on "the efficacy and effects of many of Defendants' policies and procedures, such as Defendants' alleged ignoring of 'red flags' for misuse and diversion including concerns expressed by their own pharmacists," but her expertise does not extend to *every* pharmacy policy or procedure.[149] *Id.* (quotations, emphasis, and citation omitted). The Court declined to apply its

---

[147] At the *Daubert* hearing, Lembke testified that, as a medical doctor and academic professor and researcher specializing in opioid addiction, she is intimately familiar with issues that raise "red flags" to both physicians and pharmacists regarding potential addiction and/or diversion of opioid prescriptions. 09/10/21 Hearing Tr. at 38:23-44:16 (Doc. #: 3944) (Lembke discussing her experience and knowledge of red flags). Indeed, in her role as a physician, Lembke regularly communicates with pharmacists – often multiple times a day – about "red flag" concerns regarding various prescriptions, including opioid prescriptions. *Id.* at 5:16-8:9, 11:9-12:10. Further, in her research and teachings, Lembke has studied the role of pharmacies in the prescription-opioid epidemic, including pharmacies' ability to mitigate the misuse of prescription opioids. *Id.* at 13:11-17:1.

[148] *In re Nat'l Prescription Opiate Litig.*, 2021 WL 4243084, *7 (N.D. Ohio Sept. 17, 2021).

[149] For instance, the Court found Lembke's background does not qualify her to assess whether a pharmacy: (1) sufficiently incentivized its pharmacist-employees to investigate red flags; or (2) had internal workplace rules for pharmacists that precluded a "red flag" examination. CT3 Daubert Order re Lembke at 13 (Doc. #: 3953).

ruling in detail throughout Lembke's lengthy report, stating Defendants could object at trial if Lembke testified beyond her areas of expertise. *Id.* at 13-14.

At trial, Lembke testified, "from a doctor's perspective," that the Pharmacy Defendants' national policies and procedures were not effective or adequate to detect red flags.[150]  Defendants assert these opinions exceeded the scope of Lembke's expertise and qualifications.  Joint Motion at 45 (Doc. #: 4202).  The Court disagrees.  As noted, Lembke has extensive medical knowledge and expertise regarding "red flags" that signal possible opioid addiction.  Against this backdrop, Lembke testified she examined the evolving policies and procedures of each Pharmacy Defendant, over a period of time, and determined the policies were ineffective or inadequate to detect "red flags" that were well-known in the medical community at the given time.[151]  At the *Daubert* hearing, Lembke explained the basis for these findings,[152] and her Report provides detailed support for her testimony in this regard.[153]

Further, at trial, Lembke cited specific evidence supporting her conclusions, including her review of data showing that, in Lake and Trumbull Counties, Defendants dispensed "thousands" of prescriptions for both an opioid and a Benzodiazepine, despite the fact that this particular drug combination was "well-known" to feed addiction under the current medical literature and/or DEA

---

[150] 10/06/21 Trial Tr. at 630:3-17, 632:25-33:1 (Doc. #: 4000) (Lembke).

[151] *See, e.g.,* 10/06/21 Trial Tr. at 636:4-637:3 (Doc. #: 4000) (Lembke) (Walmart's pharmacy operations manual was not kept up-to-date with state-of-the-art knowledge of how to detect and resolve red flags).  At a side bar conference, the Court confirmed to counsel that this line of testimony was permissible.  *Id.* at 637:11-15.  The Court further instructed that, under its *Track Three Daubert* ruling, Lembke could *not* testify as to what may have *caused* the inadequacies, such as internal pharmacy activities or employee incentives, because those areas went beyond her knowledge and area of expertise.  *Id.* at 637:16-638:1; *see also id.* at 622:22-24 (Lembke may not opine "about the internal workings of any particular pharmacy").

[152] *See* 09/10/21 Hearing Tr. at 17:3-19:24, 35:12-18 (Doc. #: 3944) (Lembke).

[153] *See, e.g.,* CT3 Lembke Report at 108-111 (comparing various provisions of Walmart's Pharmacy Operations Manual with prevailing information available in medical literature and DEA guidance); 122-130 (detailing various deficiencies in CVS policies and procedures); 130-135 (same as to Walgreens).

enforcement decisions published at the time.[154]  On this record, the Court concludes Lembke's testimony regarding alleged inadequacies in Defendants' policies and procedures to detect "red flags" fell squarely within the scope of her extensive medical knowledge and expertise.[155]

Defendants also challenge Lembke's testimony that "Defendants increased the supply of opioids" which, along with Defendants' failure to provide effective controls (discussed above), "led to opioid misuse and addiction."  Joint Motion at 45 (Doc. #: 4202).  It appears Defendants did not object to Lembke's testimony on these topics at trial and, thus, have waived the right to do so now.[156]  Nevertheless, even if the Court reached the merits, Defendants' arguments would fail. At trial, Lembke testified that each Pharmacy Defendant undertook misleading promotional marketing and educational activities that are "well-known and effective strategies for influencing what medicine gets prescribed [and] creating demand for a specific medication."[157]  Lembke concluded these efforts "contributed substantially" to a paradigm shift in increased opioid prescribing, thereby creating an oversupply of prescription opioids which resulted in the opioid

---

[154] 10/06/21 Trial Tr. at 628:2-629:5 (Doc. #: 4000) (Lembke).

[155] To the extent Defendants object to the "national" scope of Lembke's opinions, Defendants provide no evidence or argument suggesting a material difference in the pharmacies' roles or policies in the opioid epidemic locally, as compared to the rest of the country.  *See* CT3 Daubert Order re Lembke at 7-8 (Doc. #: 3953) (finding Lembke's use of national data creates a reasonable inference about the conditions in Lake and Trumbull Counties).

[156] *See* 10/06/21 Trial Tr. at 510-619 (Doc. #: 4000); Fed. R. Evid. 103(a) (to preserve a claim of error regarding a ruling admitting evidence, a party must timely object or move to strike on the record); *Kiss v. Kmart Corp.*, No. CIV. A. 97-7090, 2001 WL 568975, at *6 (E.D. Pa. 2001) (plaintiff's failure to object to expert testimony at trial waived her post-trial arguments of error).

[157] 10/06/21 Trial Tr. at 578-598, 608-616 (Doc. #: 4000) (Lembke).  These promotional activities included: (1) CVS offering to promote opioids for a fee to manufacturers by educating its pharmacists internally, advertising specific opioid products at the pharmacy counter, and through direct consumer mailings, Doc. #: 4000 at 582:13-584:18; (2) CVS promoting misleading messages of the opioid front group "Partners Against Pain" to its pharmacists, *id.* at 608:18-613:25; (3) Walgreens offering to send promotional materials to its pharmacists and allowing Purdue sales representatives to provide educational material internally to its pharmacists, 586:24-588:4, 614:14-616:11; and (4) Walmart promoting "prescription adherence programs" designed to get patients to stay on certain opioid medications for longer periods of time, *id.* at 589:5-17, 591:3-592:4, 593:7-594:3.

epidemic.[158] In light of Lembke's distinguished academic background on opioid prescribing and the history and origins of the opioid epidemic, combined with her first-hand experiences as a practicing physician during the relevant time frame, Lembke's testimony on these topics was well within the scope of her extensive medical knowledge and expertise.[159] Accordingly, Lembke's testimony was properly received into evidence at trial.

### e. Dr. Craig McCann

Defendants contend data expert Dr. Craig McCann provided "inherently arbitrary and unreliable" opinions, because he merely programmed algorithms reflecting "red flagging" rules suggested by other experts and offered no independent opinions regarding the validity of the underlying flagging criteria. Joint Motion at 45 (Doc. #: 4202). In its *Daubert* ruling, the Court rejected Defendants' identical arguments, finding Dr. McCann reliably utilized the "red flagging" methodology identified by another expert, Carmen Catizone, whom the Court also found to be reliable. *See* CT3 Daubert Order re McCann at 6-7 (Doc. #: 3949);[160] CT3 Daubert Order re Catizone at 7 (Doc. #: 3947) ("it would be helpful to the finder of fact to hear evidence about the

---

[158] 10/06/21 Trial Tr. at 515-521, 545-558, 582-598, 640-41 (Doc. #: 4000) (Lembke).

[159] The Court notes Lembke's *Track Three* trial testimony conceivably extended beyond the areas of expertise previously identified in the Court's *Track One Daubert* ruling. In *Track One*, the Court found Plaintiffs had not shown Lembke was qualified to offer "causal connection" opinions regarding pharmaceutical marketing, promotional, or educational efforts. CT1 Daubert Order re Lembke at 12-13 (Doc. #: 2549) (ruling Lembke could not opine these efforts resulted in, or caused, increased sales or increased prescriptions of opioids). In *Track Three*, the Court denied Plaintiffs' request to alter its *Track One* ruling. *See* CT3 Daubert Order re Lembke at 5-7 (Doc. #: 3953). Lembke's *Track Three* testimony, however, differed from her *Track One* opinions. *Compare, e.g.,* CT1 Lembke Report at 75 (the Pharmaceutical Opioid Industry promoted misconceptions that were "the *single most significant factor* giving rise to the massive increase in the sale of opioids") (emphasis added) *with* Doc. #: 4000 at 640-41 ("by increasing and assuring the supply of opioids and failing to provide effective controls," the Pharmacies' actions "*contributed* to opioid misuse, addiction, dependence, and death") (emphasis added). Because Defendants did not object or ask the Court to apply its *Track One* ruling to Lembke's *Track Three* testimony, the Court did not have occasion to determine whether or how the *Track One* ruling might apply. Had Defendants objected at trial, the Court would have allowed the testimony for the reasons stated.

[160] *In re Nat'l Prescription Opiate Litig.*, 2021 WL 4146262, *3-4 (N.D. Ohio Sept. 13, 2021).

number of potentially suspicious prescriptions that Catizone's metrics would have flagged"). Together, the opinions of Dr. McCann and Catizone provided a non-speculative evidentiary framework to aid the jury's determination of material issues in the case, including: (1) whether Defendants employed reasonable measures to identify potentially suspicious prescriptions; (2) the number of prescriptions that Defendants could have reasonably flagged; and (3) whether Defendants employed reasonable measures to avoid dispensing suspicious prescriptions.[161] Accordingly, the Court properly admitted Dr. McCann's testimony at trial.

## Conclusion

For the foregoing reasons, the Court **DENIES** Defendants' Individual and Joint Rule 50(b) Motions for Judgment as a Matter of Law (Doc. ##: 4202, 4203, 4206, and 4207).

Further, the Court **DENIES** Defendants' previously filed Rule 50(a) Motions (Doc. ##: 4098, 4100, 4102, and 4103).

**IT IS SO ORDERED.**

 /s/ Dan Aaron Polster  March 7, 2022
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

---

[161] *See, e.g., Landis v. Tailwind Sports Corp.*, No. 10-cv-00976, 2017 WL 5905509, at *6 (D.D.C. Nov. 28, 2017) (three separate expert opinions, working together, provided a non-speculative framework for the jury to use to analyze damages); Fed. R. Evid. 703(b), Advisory Committee Notes to 2000 Amendments (the requirement that expert testimony must be based on sufficient "data" is intended to encompass the reliable opinions of other experts).