# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>**This document relates to:**<br><br>    *County of Lake, Ohio v. Purdue Pharma L.P., et al.*,<br>      Case No. 18-op-45032 (N.D. Ohio)<br><br>    *County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.*,<br>      Case No. 18-op-45079 (N.D. Ohio)<br><br>**"Track 3 Cases"** | **MDL No. 2804**<br>**Case No. 17-md-2804**<br>**Judge Dan Aaron Polster** |

## WALGREENS AND WALMART
## JOINT ABATEMENT PHASE TRIAL BRIEF

Walgreens and Walmart submit this trial brief pursuant to the Court's Trial Order, Doc. 4322 at 5, to summarize key facts and controlling law as well as some of the most important evidentiary issues that may arise during trial.[1]

### Statement of Facts

This proceeding concerns the abatement of the public nuisance as found by the jury: the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels." *See* Dkt. 4176 (verdict form). Plaintiffs' abatement plan is not tailored to the abatement of that condition. Instead, they have proposed a far-reaching plan focusing almost exclusively on claimed health, societal, and other downstream effects of opioid abuse (for example, vocational training for individuals living with opioid use disorder

---

[1] References to "Defendants" herein include only Walgreens and Walmart.

("OUD"), programs to address burnout/compassion fatigue in first responders, and screening/treatment of HIV, hepatitis C, and endocarditis).[2]  Plaintiffs do not even attempt to explain how these programs and services will abate the oversupply and diversion of prescription opioids.

Even if it were designed to abate the nuisance found by the jury—which it is not—Plaintiffs' plan still would be fatally flawed because Plaintiffs overestimate its costs.  For example, Plaintiffs' estimate of the cost for the first five years of their plan—$878 million—includes the costs of existing programs that already are funded, often by the state or federal governments or other third parties; costs related exclusively to harms caused by illicit, as opposed to prescription, opioids; costs based on inflated estimates of the number of people with OUD and similar issues; costs that exceed what the Counties have historically paid or currently pay for the same or similar programs and services; and costs that reflect mathematical errors by Plaintiffs' experts.  Correcting these overstatements, Defendants' experts Dr. Daniel Kessler and Mr. Matthew Bialecki arrive at far lower estimates of the cost for the first five years of Plaintiffs' abatement plan: Dr. Kessler estimates the actual cost to be $346 million, while Mr. Bialecki places the cost at under $35 million based on his analysis of Plaintiffs' current funding of such programs.  Of particular note, Mr. Bialecki is the only expert to have considered what the Counties have *actually paid* for the services and programs called for by Plaintiffs' plan.  By contrast, none of Plaintiffs' experts ever spoke with any County officials or reviewed any County records to determine the actual need for or cost to the Counties for the services and programs set out in Plaintiffs' plan.

---

[2] Defendants continue to object to Plaintiffs' plan for all the reasons set forth in Defendants' Joint Brief Regarding Select Legal Issues for Remedies Phase, Track 3 Defendants' Joint Submission Concerning Plaintiffs' Abatement Plan, and Track 3 Defendants' Abatement Plan.  *See* Dkt. 4299, 4315, 4337.  This includes the objection that Plaintiffs' plan is vague and indeterminate.

Finally, regardless of the accuracy of Plaintiffs' cost estimate, any cost awarded should be reduced to apportion to each Defendant only *its share* of the total cost, rather than forcing Defendants to pay for costs attributable to other responsible parties.  To that end, Defendants' experts Dr. Kessler, Dr. Joseph Doyle, Mr. Robert Brunner, and Dr. Amitabh Chandra provide different approaches to apportion any award to Plaintiffs so as to (1) exclude claimed costs attributable to illicit opioids; (2) exclude claimed costs attributable to non-Defendant actors who contributed to the nuisance the jury found; and (3) apportion claimed costs to each Defendant based on its market share of opioid prescriptions dispensed in the Counties.  Defendants' experts estimate the appropriate share of contribution to the nuisance the jury found in ranges of 0.445% to 2.8% for CVS, 0.693% to 2.8% for Walgreens, and 0.176% to 1.0% for Walmart in Lake County and 0.308% to 0.7% for CVS, 0.832% to 2.5% for Walgreens, and 0.031% to 0.2% for Walmart in Trumbull County.  These findings are consistent with the small percentage of total opioid prescriptions dispensed in the Counties that were filled by a Defendant and flagged by Plaintiffs.

## Controlling Law

Because Defendants already addressed the proper nature and scope of the abatement remedy in their joint briefing regarding select legal issues for the remedies phase, Defendants provide only a brief summary here.  *See generally* Dkts. 4299, 4342.  "An equitable remedy's sole purpose is to eliminate the hazard that is causing prospective harm to the plaintiff."  *People v. ConAgra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 132, 227 Cal. Rptr. 3d 499, 569 (2017).  Thus, an award to address the *health, societal, and other indirect, downstream effects* of a nuisance (as opposed to the nuisance itself) is a damages award, not abatement.  An abatement plan must be limited both to the specific nuisance that the jury found (the oversupply and diversion of prescription opioids in the two Plaintiff counties) and to the portion *of that nuisance* reasonably

attributable to each Defendant's conduct (dispensing).  As Defendants already have argued, Plaintiffs' plan meets none of these standards.

For those narrow categories of relief contained in Plaintiffs' plan that constitute abatement of the nuisance the jury found, Plaintiffs must prove the calculation of the costs of such forward-looking relief in a non-speculative manner.  That becomes increasingly more difficult as the temporal scope of the requested relief expands.  The only court to date to have awarded an abatement remedy in a prescription opioids case limited that remedy to one year, rejecting plaintiffs' 20-year abatement plan because the State "did not present sufficient evidence of the amount of time and costs necessary, beyond year one, to abate the Opioid Crisis."  *See State of Oklahoma v. Purdue Pharma L.P.*, No. CJ Case 2017-816, 2019 WL 9241510, at *15 (Okla. Dist. Ct. Nov. 15, 2019), *rev'd on other grounds by State ex rel. Hunter v. Johnson & Johnson*, 2021 OK 54, 499 P.3d (Okla. 2021).[3]

This accords with the general rule under tort law that a party seeking compensatory damages must prove (1) certainty that damages will occur; and (2) reasonable certainty as to the amount of those damages.  Restatement (Second) of Torts § 912 (1979) ("One to whom another has tortiously caused harm is entitled to compensatory damages for the harm if, but only if, he establishes by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit."); *Galayda v. Lake Hosp. Sys., Inc.*, 1994-Ohio-64, 71 Ohio St. 3d 421, 425, 644 N.E.2d 298, 301 ("In Ohio, a plaintiff is entitled to an award of damages to compensate him for losses which he is reasonably certain to incur in the future.").  The same principle is true under contract law.  *See*

---

[3] The Supreme Court of Oklahoma later held that the State's public nuisance claim was not cognizable because Oklahoma nuisance law is properly addressed to "discrete, localized problems, not policy problems."  *Hunter*, 2021 OK 54, ¶ 39, 499 P.3d at 731.

4

Restatement (Second) of Contracts § 352 (1981) ("Damages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty."); *Palmer v. Connecticut Ry. & Lighting Co.*, 311 U.S. 544, 559 (1941) (limiting damages for breach of lease to eight years, noting that future damages must be limited to "as far as reasonable, intelligent men can foresee the future"); *Cleveland Builders Supply Co. v. Farmers Ins. Grp. of Cos.*, 102 Ohio App. 3d 708, 716, 657 N.E.2d 851, 855 (1995) (rejecting contract damages under Ohio law as "speculative and uncertain").  These same principles apply to the abatement remedy.

Plaintiffs have stated that they intend initially to seek funds for the first five years of their plan at the upcoming trial.  *See* Dkt. 4232 at 2.  Even when limited in this way, their plan violates the principle that the harm to be abated cannot be speculative.  If the Court orders abatement relief during Phase II of trial, the award should be limited to one year.  The nuisance the jury found is the current oversupply of prescription opioid medications, and one year provides a sufficient period for expanded takeback and disposal programs to abate that oversupply.  Plaintiffs' additional assertion that the abatement may run an additional 10 years, apparently depending on the relative success of the initial five years, is all the more speculative.

If the Court awards additional interventions beyond drug take-back programs, those should be limited to one year as well.  Projecting the elements and costs of the sort of treatment programs and other interventions Plaintiffs seek becomes more unreliable for each additional year into the future.  *See, e.g.*, Trial Tr. (Dkt. 4050) at 2762, 2764, 2765 (Plaintiffs' witness Captain Villanueva testifying that "drug trends will change on a weekly basis").  Forward-looking projections necessarily speculate about whether, among other things: (i) addiction and its related expenses in the future will stem in any way from diversion of an "oversupply" of prescription opioids; (ii) addiction patterns in the community will remain the same; (iii) prescription opioids will remain a

drug of choice; (iv) recovery rates will hold constant; (v) treatment will be the same; (vi) the number of individuals with OUD that may seek treatment under Plaintiffs' abatement plan will remain constant; (vii) the use of safe storage and drug disposal of unused medication will reduce opioid overdose or other opioid-related harm; and (viii) persons with OUD will actually use available treatment and mental health services.  Any period beyond one year would be speculative and would result in program elements and funding that would be even more disconnected from the nuisance the jury found.

To the extent that the Court awards future relief, it should mitigate speculation about future costs by requiring a mechanism to ensure that the funds are spent to abate the nuisance the jury found, as well as on expenses that are actually incurred and that align with the Court-approved abatement plan.  In *Liddell v. Board of Education of City of St. Louis*, 771 F. Supp. 1496, 1498 (E.D. Mo. 1991), the court reviewed the City Board's asbestos abatement program, funded by the state and governed by the federal Asbestos Hazard Emergency Response Act and implementing regulations.  The court rejected an open-ended quarterly payment schedule for projected costs as they accrued, because the proposed schedule "prevent[ed] review by the State as to accuracy and reasonableness of the costs and [was] open to abuse."  *Id.* at 1502.  Instead, the court stated that a "checks and balance" system should "be worked out amicably between the City Board and the State, with assistance from the Financial Advisor."  *Id.*  The court ordered that a "payment method must be developed which affords the State the opportunity to review the costs while allowing the City Board to continue the prompt implementation of its asbestos abatement program."  *Id.*

The same is true here.  If it does so at all, the Court should award future abatement costs in a form that allows Defendants to audit the expenditures against an approved abatement plan outlining which expenditures are permissible.  Payments to the fund should be staggered, and if

Plaintiffs cannot spend the funds provided in the first waves for legitimate abatement expenses, Defendants should not be required to pay any additional sums into the fund.  Funds should revert to Defendants if not spent in accordance with the abatement plan.  Such a system will root out waste and abuse.

Finally, the Court has indicated an intent to order injunctive relief.  In that regard, Defendants note that, despite multiple opportunities to offer an abatement plan, Plaintiffs have never sought—and indeed *still* do not seek—injunctive relief.  In that context, awarding injunctive relief would be highly inappropriate.  *See United States v. Sineng-Smith*, 140 S. Ct. 1575, 1578 (2020) (under principle of party presentation, the court must decide case as "shaped by the parties").  Thus, the only injunctive relief that is even arguably appropriate is the operation of drug take-back programs, to which Defendants have alluded.

Moreover, "courts generally grant relief in a party-specific and injury-focused manner," *Arizona v. Biden*, No. 22-3272, 2022 WL 1090176, at *10–*12 (6th Cir. Apr. 12, 2022) (Sutton, C.J., concurring), and "the scope of injunctive relief is dictated by the extent of the violation established," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Because Plaintiffs have established a public nuisance only in Lake and Trumbull Counties, and only under Ohio law, this case provides no basis for injunctive relief, if any, beyond those two Counties.  *See Mitchell v. Abercrombie & Fitch*, No. C2-04-306, 2005 WL 1159412, at *2 (S.D. Ohio May 17, 2005) ("A state's laws are presumptively territorial and confined to limits over which the law-making power has jurisdiction." (quoting *Sandberg v. McDonald*, 248 U.S. 185, 195 (1918))).

### Key Evidentiary Issues

Defendants anticipate two key evidentiary issues: (1) determining which side has the burden to prove apportionment and (2) whether the Court will permit Plaintiffs to support their main contentions with hearsay.

The parties already have briefed the issue of which side has the burden to prove apportionment.  *See generally* Dkts. 4299, 4342.  Plaintiffs try to put the burden on Defendants— who constitute a tiny fraction of all entities whom Plaintiffs themselves allege caused the nuisance found by the jury—to prove that they do *not* owe the entire amount Plaintiffs say is necessary to abate that nuisance.  For the reasons already explained, *see, e.g.*, Dkt. 4342 at 15–19, this unsupported approach is out of step with the Restatement and Ohio law and would violate Defendants' right to due process.

Other than that already-briefed issue, Defendants believe that most of the evidentiary concerns during the abatement phase will revolve around whether portions of Plaintiffs' proof are inadmissible hearsay, and thus fail to meet Plaintiffs' burden to support their request for abatement relief.

As an initial matter, the Federal Rules of Evidence apply to this phase of the case, even though it is a bench trial in what the court has deemed an equitable proceeding.  *See* Fed. R. Evid. 1101(a), (b); *see, e.g.*, *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) ("Rule 702 applies whether the trier of fact is a judge or a jury.").[4]  Under those Rules, hearsay without an exception is inadmissible.  Fed. R. Evid. 802.  Yet Defendants expect that Plaintiffs will try to use hearsay in several ways prohibited by the Rules.

*First*, the Court should not permit Plaintiffs to introduce their expert reports wholesale into evidence.  Expert reports prepared in anticipation of trial are generally not admissible evidence at trial because they are considered hearsay.  *See Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 729 (6th Cir. 1994).  "Rules 702 and 703 carve out a narrow exception to the rule against the

---

[4] Defendants maintain their objection that the Seventh Amendment requires a jury, not a judge, to determine the facts relating to the relief Plaintiffs seek.  *See* Dkt. 4299 at 24–27.

8

admission of hearsay" to allow experts to "*testify* as to their opinion, and rely on inadmissible evidence" in forming those expert opinions.  *Id.* (emphasis in original)  But "[n]either their written opinions nor the materials on which they relied upon [are] admissible under Rules 702 and 703." *Id.*  Thus, Plaintiffs must rely exclusively upon the trial testimony of their experts; they cannot introduce the reports of even testifying experts into evidence.  *See id.* (district court's "conclusion that Rules 702 and 703 permit the admission of [testifying experts' pre-trial reports] was erroneous").

Relatedly, Plaintiffs likely will again try to use expert witnesses as channels to admit hearsay.  At the liability trial, this Court suggested that if documents were "shown to [an expert] in preparation of her report," she "can testify [about] whatever she was given."  Dkt. 4000 at 477–78; *see also, e.g.*, *id.* at 480–81 ("[S]he can testify about anything she was shown."), 600 ("If this is a document [the expert] reviewed," she can read its contents aloud).  Then, in its order denying a new trial, the Court modified this suggestion to some degree by recognizing that the expert has to in fact *rely on* the hearsay rather than simply review it.  Dkt. 4296 at 28.  Neither suggestion adheres to the general rule that experts are precluded from disclosing inadmissible evidence in their testimony.  *See Williams v. Illinois*, 567 U.S. 50, 80–81 (2012).

At the upcoming trial, Plaintiffs' experts cannot simply repeat inadmissible hearsay. Experts must convey "an independent judgment" about their opinions; any references to hearsay must be in passing only—and must "only incidentally disclose[] the [hearsay] to assist the jury in evaluating the expert's opinion."  *United States v. Rios*, 830 F.3d 403, 418 (6th Cir. 2016).  Experts may not "simply parrot[] another individual's out-of-court statement."  *Id.*  It "falls to the [trial] court to ensure that 'the expert witness is truly testifying as an expert and not merely serving as a conduit'" for hearsay.  *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, No. 06-cv-

2781, 2009 WL 10689369, at *2 n.1 (N.D. Ohio Oct. 23, 2009); 29 Fed. Prac. & Proc. Evid. § 6273 (2d ed.) ("Rule 703 does not authorize admitting hearsay on the pretense that it is the basis for expert opinion when, in fact, the expert adds nothing to the out-of-court statements other than transmitting them to the jury.").  To the extent that the expert must incidentally disclose hearsay, such hearsay must be evidence "of a type reasonably relied upon by experts," *e.g.*, scientific literature, and not communications created for the purpose of litigation or expert deliberation.  *See, e.g.*, *Gong v. Hirsch*, 913 F.2d 1269, 1272–73 (7th Cir. 1990) (prohibiting medical expert from testifying about a letter "made by a doctor who was not the treating physician . . . for the presumed purpose of obtaining employment disability benefits" deemed inadmissible hearsay).

*Second*, Defendants anticipate possible hearsay issues in connection with Plaintiffs' two fact witnesses, Kim Fraser and April Caraway.  At the liability trial, Plaintiffs' counsel argued that a witness can testify about anything she is told while conducting an investigation.  Dkt. 4050 at 2790–92.  This Court agreed, reasoning that if someone has "investigated" something and talked to witnesses, "[i]t isn't just hearsay." *Id.* at 2792.  But a witness testifying about "what he's been told," *id.*, fits the very definition of hearsay.  Without an exception, a statement that "(1) the [witness] does not make while testifying at the current trial or hearing" and that is (2) "offer[ed] in evidence to prove the truth of the matter asserted in the statement" is inadmissible.  Fed. R. Evid. 801.  There is no "investigation" exception to hearsay.  *See, e.g.*, *United States v. Arnold*, 486 F.3d 177, 193 (6th Cir. 2007) (en banc) (refusing to allow an "investigator [to go] on the stand to introduce statements" of witnesses); *Sanders v. Dorris*, 81 F.3d 161, at *2 (6th Cir. 1996) (table) (refusing to allow a witness to "testif[y] as to her memory of a statement allegedly made by [a witness]"); *Miller v. Caterpillar Tractor Co.*, 697 F.2d 141, 144 (6th Cir. 1983) (refusing to admit

investigator's report because it relied on hearsay).  If similar issues arise in the upcoming trial, this Court must sustain Defendants' hearsay objections.

*Third*, Defendants anticipate other hearsay issues coming up at trial, especially as they relate to the testimony of witnesses who collected historical expenditures from other government officials.  These historical expenditures are out-of-court statements that presumably will be offered for their truth (for example, the amount of money Plaintiffs spent on a given thing).  Plaintiffs must, therefore, find a hearsay exception that would allow these statements to be admitted (for example, the business-records exception).  They cannot simply put on the stand a witness who said that he or she talked to another person who reported what the numbers were, and then communicate those out-of-court statements for their truth.

## Conclusion

For these reasons, the Court should limit the remedy in this case, if any, to operating drug take-back programs over the span of one year.  If the Court nonetheless awards any additional interventions beyond drug take-back programs, they also should be limited to one year.  Regardless, the Court should apportion any award of claimed future abatement costs to each Defendant so that its share of the costs corresponds to its claimed contribution to the actual nuisance the jury found, and the Court should structure the award in a way that allows Defendants to audit the expenditures against an approved abatement plan outlining which expenditures are permissible.  In the course of determining appropriate relief, Plaintiffs should carry the burden of apportionment.  And the Court should prohibit the admission of hearsay through Plaintiffs' witness testimony.

Dated:  April 25, 2022

Respectfully submitted,

*/s/*  John M. Majoras

John M. Majoras
Benjamin C. Mizer
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com
E-mail: bmizer@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tmtabacchi@jonesday.com
E-mail: tfumerton@jonesday.com

*Counsel for Walmart Inc.*

/s/ Jeffrey A. Hall
Kaspar J. Stoffelmayr
Jeffrey A. Hall
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
jeff.hall@bartlitbeck.com

Katherine L.I. Hacker
Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
kat.hacker@bartlitbeck.com
alex.harris@bartlitbeck.com

*Counsel for Walgreens Boots Alliance, Inc.,
Walgreen Co., and Walgreen Eastern Co., Inc.*

13

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via email on all counsel of record on April 25, 2022.

/s/  John M. Majoras
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*Counsel for Walmart Inc.*

14